UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

WEIDONG GUAN,
    a/k/a "Bill Guan,"

        *Defendant*.

No. 24-cr-322 (VM)

ORAL ARGUMENT REQUESTED

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT WEIDONG GUAN'S MOTION TO COMPEL
## *BRADY* AND *GIGLIO* DISCOVERY

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

RELEVANT BACKGROUND .......................................................................................... 7

    I.      China's Longstanding Campaign to Repress Falun Gong and
           *The Epoch Times* ............................................................................................ 7

    II.     Countermeasures by Falun Gong and *The Epoch Times* to Counteract
           the CCP .......................................................................................................... 10

    III.    The Government's Charges and Expected Evidence Against Mr. Guan .............. 11

    IV.    Mr. Guan's *Brady* Requests and the Government's Response ............................ 12

ARGUMENT ...................................................................................................................... 13

    I.      The Requested Documents Are Material and Favorable to Mr. Guan's Defense. 13

    II.     The "Prosecution Team" Includes Federal Agencies That Possess and
           Have Knowledge of the Requested Documents..................................................... 18

CONCLUSION................................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berger v. United States*,
295 U.S. 78 (1935), *overruled on other grounds*, *Stirone v. United States*, 361
U.S. 212 (1960) ................................................................................................................... 17

*Brady v. Maryland*,
373 U.S. 83, 87 (1963) ................................................................................................ *passim*

*Giglio v. United States*,
405 U.S. 150, 154 (1972) ............................................................................................ *passim*

*Kyles v. Whitley*,
514 U.S. 419 (1995) ..................................................................................................... 13, 17

*Orena v. United States*,
956 F. Supp. 1071 (E.D.N.Y. 1997) .................................................................................. 13

*United States v. Alexandre*,
2022 WL 16798756 (S.D.N.Y. Nov. 8, 2022) ................................................................... 22

*United States v. Aref*,
533 F.3d 72 (2d Cir. 2008) ................................................................................................. 13

*United States v. Avellino*,
136 F.3d 249 (2d Cir. 1998) ............................................................................................... 17

*United States v. Cerna*,
633 F. Supp. 2d 1053 (N.D. Cal. 2009) ............................................................................. 19

*United States v. Chalmers*,
410 F. Supp. 2d 278 (S.D.N.Y. 2006) ............................................................................... 18

*United States v. Coonan*,
938 F.2d 1553 (2d Cir. 1991) ............................................................................................. 17

*United States v. Coppa*,
267 F.3d 132 (2d Cir. 2001) ............................................................................................... 12

*United States v. Gupta*,
848 F. Supp. 2d 491 (S.D.N.Y. 2012) ............................................................................... 18

*United States v. Hamilton*,
3 F. App'x 7 (2d Cir. 2001) ............................................................................................... 14

*United States v. Huezo*,
    546 F.3d 174 (2d Cir. 2008).................................................................................14

*United States v. Hwa*,
    2021 WL 11723583 (E.D.N.Y. Sept. 3, 2021) ......................................................12

*United States v. Kwok*,
    2024 WL 732109 (S.D.N.Y. Feb. 21, 2024)....................................................15, 16

*United States v. Martoma*,
    990 F. Supp. 2d 458 (2014) ..................................................................................19

*United States v. McDow*,
    206 F. Supp. 3d 829 (S.D.N.Y. 2016)...................................................................12

*United States v. Meregildo*,
    920 F. Supp. 2d 434 ........................................................................................18, 21

*United States v. Middendorf*,
    2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018)......................................................21

*United States v. Percoco*,
    2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ......................................................16

*United States v. Rittweger*,
    524 F.3d 171 (2d Cir. 2008)..................................................................................15

*United States v. Rodriguez*,
    496 F.3d 221 (2d Cir. 2007)..................................................................................13

*United States v. Serrano*,
    224 F. Supp. 3d 248 (S.D.N.Y. 2016)...................................................................14

*United States v. Weber*,
    843 F. App'x 364 (2d Cir. 2021) ..........................................................................14

*United States v. Wider*,
    184 F. Supp. 3d 10 (E.D.N.Y. 2016) ....................................................................14

**Statutes**

Classified Information Procedures Act.........................................................................13

**Other Authorities**

Congressional-Executive Commission on China, 2025 Annual Report, Executive
Summary, https://www.cecc.gov/sites/evo-subsites/cecc.house.gov/files/evo-
media-document/cecc-2025-ar-executive-summary.pdf ........................................................7

Congressional Record, U.S. House of Representatives, Remarks of Hon. Ralph
Norman (S.C.)
https://www.congress.gov/118/crec/2023/07/13/169/120/CREC-2023-07-13-
pt1-PgH3485.pdf;.................................................................................................................8

About OCDETF, Dep't of Justice, https://www.justice.gov/archives/ocdetf/about-
ocdetf...................................................................................................................................20

*California Man Sentenced For Acting As An Illegal Agent Of The PRC
Government And Bribery*, Dep't of Justice, Nov. 19, 2024, available at:
https://www.justice.gov/usao-sdny/pr/california-man-sentenced-acting-illegal-
agent-prc-government-and-bribery ...............................................................................6, 7

*Chief Financial Officer Of Multinational Media Company Charged With
Participating In Scheme To Launder At Least $67 Million In Fraud Proceeds*,
Dep't of Justice, June 3, 2004, available at: https://www.justice.gov/usao-
sdny/pr/chief-financial-officer-multinational-media-company-charged-
participating-scheme ...................................................................................................19, 20

*China*, Sarah Cook, Freedom House, 2017, available at
https://freedomhouse.org/report/2017/battle-china-spirit-falun-gong-religious-
freedom#footnote9_cAb0FK5Ak0t8zqOTblmtGwTnriizXOMGP4KW0A7B0
A_uolECqT1Z4m5 .............................................................................................................10

*China: Transnational Repression Origin Country Case Study*, Freedom House,
2021, available at: https://freedomhouse.org/report/transnational-
repression/china ...................................................................................................................7

*Cyber Operation Whose Targets Included The Epoch Times*, The Epoch Times,
Mar. 5, 2025, available at https://www.theepochtimes.com/china/us-sanctions-
12-chinese-hackers-intelligence-officials-for-massive-hacking-campaign-
5820500?src_src=RTNews&src_cmp=rtbreaking-2025-03-05-
5&est=AAAAAAAAAAAAAAAAZe8idhsN3MWYueFWnmJUCr12hUAB
KtJJc9sDetSfWYG%2F3mt%2FdxE%3D .......................................................................9

Hearing of the Comm. on Int'l Relations, U.S. House of Representatives, 109th
Congress, July 21, 2005, available at:
https://www.govinfo.gov/content/pkg/CHRG-109hhrg22579/pdf/CHRG-
109hhrg22579.pdf.................................................................................................................8

*IFJ Condemns China's 'Brutal Vendetta' Against Independent Newspaper*,
International Federation of Journalists, Mar. 1, 2006, available at:
https://www.ifj.org/media-centre/news/detail/article/ifj-condemns-chinas-
brutal-vendetta-against-independent-newspaper .......................................................................8

Reporters Without Borders, Feb. 14, 2006, available at:
https://rsf.org/en/journalist-epoch-times-assaulted-atlanta-newspaper-accuses-
chinese-authorities ....................................................................................................................8

Fed. R. of Crim. Procedure Rule 16.................................................................................16, 17

Santul Nerkar, The N.Y. Times, May 13, 2026, available at:
https://www.nytimes.com/2026/05/13/nyregion/china-covert-police-nyc-
verdict.html ..........................................................................................................................7, 8

*U.S. And International Victims On Behalf Of The Chinese Government*, Dep't of
Justice, Mar. 4, 2025, available at: https://www.justice.gov/usao-sdny/pr/10-
chinese-nationals-charged-large-scale-hacking-us-and-international-victims-
behalf......................................................................................................................................8

William Zheng, *'Beijing blocked my bank accounts': Chinese dissident in US says
Communist Party froze his life savings*, South China Morning Post, Nov. 19,
2020, available at: https://finance.yahoo.com/news/beijing-blocked-bank-
accounts-chinese-093000123.html.........................................................................................15

Defendant Weidong Guan ("Mr. Guan"), through his undersigned counsel, respectfully moves this Court to grant his motion seeking to compel the production of all classified and non-classified documents concerning (1) any surveillance, interference, and targeting of Mr. Guan, the Falun Gong community, and *The Epoch Times* employees and executives by the People's Republic of China, the Chinese Communist Party, and their agents and proxies; (2) any counter-surveillance and counter-intelligence efforts by the FBI or other DOJ or U.S. agencies into Mr. Guan, the Falun Gong community, and *The Epoch Times*; and (3) any intelligence and counter-intelligence gathered by DOJ or other U.S. agencies of transnational repression activities targeting Mr. Guan, Falun Gong, or *The Epoch Times* by the People's Republic of China, the Chinese Communist Party, and their agents and proxies, pursuant to *Brady, Giglio*, and their progeny.

## **INTRODUCTION**

The Government is fond of saying that it knows its *Brady* and *Giglio* obligations and will comply with them. In this case, however, the Government has cavalierly dismissed Mr. Guan's forthright request for material, favorable, and exculpatory evidence that – if undisclosed – would violate his due process right to a fair trial. Instead, it has blithely asserted that it complied with its *Brady* and *Giglio* obligations even though it has produced none of the requested information. The evidence that Mr. Guan has requested bears directly on his contemporaneous knowledge, intent, and belief underlying the alleged charged conduct. This evidence creates a reasonable doubt as to whether the Government can prove the essential elements of the money laundering conspiracy and bank fraud charges here – if not vitiate them entirely – and thus, this Court should direct the Government to produce them promptly, or at a minimum, assure the Court (*in camera* if necessary) that a legally fulsome and adequate search with sufficient diligence has been conducted as to the FBI, DOJ, and other salient agencies, and that no such evidence exists in the possession, custody, or control of the U.S. Attorney's Office or the relevant agencies identified below.

Mr. Guan is a seasoned and dedicated practitioner of Falun Gong, a spiritual movement that the People's Republic of China ("PRC") and Chinese Communist Party ("CCP") have designated as an enemy of the state. For nearly three decades, the CCP relentlessly has waged a state-sanctioned campaign to eradicate Falun Gong and its followers through surveillance, harassment, assault, detention, and even torture. The CCP has especially targeted dissidents like Mr. Guan who reside abroad through a transnational repression campaign to monitor their every move, interfere with their daily personal, financial, and professional communications and affairs, harass their family members in China, and intimidate them into renouncing their faith in Falun Gong. Indeed, for nearly three decades, Mr. Guan personally has experienced the CCP's repression campaign – he believes that he has been wiretapped, tailed, intimidated, and harassed, and his family members have been threatened by virtue of their association with him. And his status as the long-time Chief Financial Officer of *The Epoch Times* – a media outlet that is highly critical of the CCP and whose executives have ties to Falun Gong – has only amplified the CCP's efforts to target him.

Such targeting and interference is specific to Mr. Guan and general to those associated with the Falun Gong and *The Epoch Times*. The public record is replete with incidents in which followers of Falun Gong and employees of *The Epoch Times* have been framed for crimes they did not commit or had their online communications and financial accounts hacked by CCP agents. Indeed, even the Government does not (and cannot) dispute that the CCP has sought to repress the Falun Gong community because many of these incidents have been the subject of federal criminal prosecutions in this district. And, in addition to prosecuting these crimes, it is no secret that the Government has engaged in countersurveillance operations to combat the CCP's extraterritorial

2

repression campaign, including efforts by the FBI, the National Security Division of DOJ, and the U.S. Attorney's Office for the Southern District of New York.

The CCP's near-pervasive and constant repression activities have clearly driven the way that Mr. Guan and many Falun Gong adherents have lived their lives – ways that many average American citizens may find unusual and even suspicious. Mr. Guan has long-implemented specific defensive and risk-reduction measures in his daily life to counteract and mitigate what he perceives as a grave threat of harm by the CCP. These measures, which include using multiple phone numbers, bank accounts, encryption features, and other countersurveillance tactics, are designed to elude and obfuscate the CCP's attempts to infiltrate and interfere with his life.

In view of these realities, Mr. Guan respectfully asked the Government to disclose both classified and unclassified evidence that the PRC and CCP have targeted, surveilled, and harassed Mr. Guan, Falun Gong practitioners, and/or *The Epoch Times* employees; classified and unclassified evidence of countersurveillance by DOJ, FBI, and other U.S. law enforcement or counterintelligence agencies into Mr. Guan, Falun Gong practitioners, and/or *The Epoch Times* executives and employees; and any classified or unclassified reports or records of the PRC and CCP's repression campaign possessed by relevant U.S. agencies.

The requested evidence is unquestionably *Brady* and *Giglio* material because it directly goes to Mr. Guan's honest and good faith belief, motivations, knowledge, and intent at the time he engaged in the alleged conduct at issue and provides an innocent explanation for such conduct.

For example, the Government alleges and intends to present evidence that Mr. Guan engaged in suspicious conduct to conceal the illicit nature of the proceeds that he allegedly laundered by "layering" transactions, and that he then lied about the true purpose of these transactions when asked about them by bank representatives. But the evidence that Mr. Guan has

requested here directly undercuts the Government's narrative that these actions were taken for a nefarious purpose – rather, it would demonstrate that Mr. Guan believed and knew that he was opening up hundreds of bank accounts *not* to evade detection by the U.S. authorities, but to evade detection by the PRC and CCP and to avoid the PRC and CCP's efforts to interfere with his and *The Epoch Times'* financial affairs.  Evidence that the PRC and CCP were targeting him or others at Falun Gong and *The Epoch Times* is unquestionably relevant and material to Mr. Guan's defense because it legitimizes and substantiates the basis of Mr. Guan's fears of CCP interference, and presents an alternative, innocent explanation for why he did what the Government alleges he did. And the fact that the FBI, DOJ, and other U.S. law enforcement or intelligence agencies were conducting countersurveillance on these same issues further validate – and render more credible – Mr. Guan's innocent knowledge and belief in the eyes of the jury.

Despite the clear *Brady* and *Giglio* implications of Mr. Guan's request, the Government has categorically refused to provide any such evidence, let alone confirm that it has searched for – or committed to searching for – the files of its prosecutors *and* the host of agents at other agencies they worked with to investigate the underlying facts of this case.  In short, without admitting it is doing so, the Government effectively has rejected the indisputable proposition that the requested evidence constitutes *Brady* or *Giglio* material, and minimizes other agencies' involvement despite the Government's prior statements regarding those agencies' involvement in the Guan investigation and despite other government agencies publicly announcing and taking credit for Mr. Guan's indictment.

The Government's position here is deeply problematic and undermined by ***its own press release***, which reflects a joint announcement of the charges by the then-U.S. Attorney and two senior officials of the Department of Labor's Office of the Inspector General ("DOL-OIG") and

4

the Department of State's Diplomatic Security Services ("DSS").  The press release explicitly acknowledges the DOL-OIG's involvement in "***investigat[ing] allegations of fraud involving the U.S. Department of Labor's unemployment insurance program***," and the DSS's "***capacity to collaborate effectively with both U.S. and international law enforcement agencies on complex transnational cases***."  And, the press release expressly credits the "U.S. Customs and Border Protection ['CBP'] for its ***valuable assistance***" in the case.

In addition, the Government explicitly has represented in papers filed with this Court that this case was jointly investigated with other agencies representing, among other things, that this "case has ***been investigated by, and ultimately charged with the assistance of***, the following investigating agencies: … the U.S. Department of Labor's Office of Inspector General ('DOL-OIG'), and the U.S. Department of State's Diplomatic Security Service ('DSS')."  (Gov't Opposition to Defs. Pretrial Motions, Doc. No. 104 at 8.)  Thus, while the Government now asserts that these and other agencies had limited involvement in the investigation and prosecution of this case, its own words – both to this Court and to the public – utterly belie this disingenuous position. These other agencies and the Government cannot have it both ways – publicly taking credit for their outstanding roles in investigating and charging Mr. Guan, including by jointly announcing his indictment – and now denying sufficient involvement to avoid compliance with their sacrosanct *Brady* and *Giglio* obligations.

Under well-settled law in this district, prosecutors are obligated to produce any *Brady* and *Giglio* materials that they have knowledge of, *and* those that are possessed by any other agencies with whom the prosecutors conducted a joint investigation.  For *Brady* and *Giglio* purposes, as set forth below, the law is clear:  it is enough that the prosecutors and agencies are engaged in joint *fact-gathering*, even if they make separate investigatory or charging decisions, because the purpose

5

of *Brady* and *Giglio* is to apprise a defendant of exculpatory or impeachment evidence obtained during the fact-finding that might not otherwise be available to him.  It is utterly irrelevant as to how agencies use the facts discovered jointly, and the joint investigation need not result in a joint prosecution.

At a minimum then, the DOL-OIG, DSS, and CBP are agencies – *i.e.,* those explicitly acknowledged in the Government's press release – that jointly investigated the case with prosecutors from the U.S. Attorney's Office.  The prosecutors' contention that *none* of these agencies were part of their investigation team is contradicted by the plain language of their own press release, which concedes that "[t]his prosecution is part of an Organized Crime Drug Enforcement Task Forces ('OCDETF') operation … using a prosecutor-led, intelligence-driven, ***multi-agency approach.***"  This assertion alone establishes that there necessarily are other agencies – separate and apart from the U.S. Attorney's Office – that jointly investigated and gathered facts in this case, and whose knowledge of any *Brady* or *Giglio* evidence must be imputed to the prosecution team.  And the Government can't have it both ways.

But there very well may be other federal and state agencies that are part of the prosecution team and whose files the prosecutors should be obligated to search for *Brady* and *Giglio* materials, including others from OCDETF.  Instead of providing a meaningful explanation to Mr. Guan, the Government simply has shrugged its shoulders and washed its hands of doing anything other than asking him to trust them that the *Brady* and *Giglio* materials he seeks are not required to be produced.  Given the grave and irredeemable consequences of a *Brady* or *Giglio* violation – and the commensurate threats both to justice and judicial economy, particularly in a case that  has been represented as requiring up to six weeks of trial – the prosecutors should be directed to identify the nature and extent of the prosecutor's relationship with each agency that worked on the

6

investigation or prosecution of this case, and to confirm whether or not those agencies possess – or may possess – any of the requested *Brady* or *Giglio* material.

For these reasons and those that follow, Mr. Guan respectfully asks this Court to grant his Motion to Compel.

## **RELEVANT BACKGROUND**

### **I.        China's Longstanding Campaign to Repress Falun Gong and *The Epoch Times***

For nearly 30 years, the PRC and CCP that controls it and all of its police and intelligence agencies have waged a systematic campaign to eradicate Falun Gong – a spiritual movement that the CCP views as "one of the 'Five Poisons,' or one of the top five threats" to its authority.[1] Beginning in 1999, the CCP created a massive PRC state apparatus to surveil, harass, torture, and imprison Falun Gong adherents both in China and abroad.  Today, the CCP's targeting of Falun Gong remains one of the "most sophisticated, global, and comprehensive campaign[s] of transnational repression in the world."[2]

The CCP's efforts to infiltrate and suppress the Falun Gong community in the United States is well-documented and undisputed.  The public record is replete with incidents in which the PRC, CCP, and their agents and proxies have deployed "tactics ranging from verbal and online harassment to lawfare, as well as physical intimidation such as through overseas police 'service stations'" targeting dissidents like Mr. Guan.[3]  Falun Gong practitioners have faced "regular

---

[1]        *California Man Sentenced For Acting As An Illegal Agent Of The PRC Government And Bribery*, Dep't of Justice, Nov. 19, 2024, available at: https://www.justice.gov/usao-sdny/pr/california-man-sentenced-acting-illegal-agent-prc-government-and-bribery.

[2]        *China: Transnational Repression Origin Country Case Study*, Freedom House, 2021, available at: https://freedomhouse.org/report/transnational-repression/china.

[3]        *2025 Annual Report – Executive Summary*, Congressional-Executive Commission on China, Dec. 12, 2025, available at: https://www.cecc.gov/sites/evo-subsites/cecc.house.gov/files/evo-media-document/cecc-2025-ar-executive-summary.pdf (China has "continued a multifaceted campaign of transnational repression against members of the Chinese diaspora and critics of the Chinese Communist Party (CCP) to intimidate individuals and stifle dissent … Cases of transnational repression this reporting year include … harassment of Falun Gong practitioners.").

reprisals" including "frequent harassment and occasional physical assaults by members of visiting Chinese delegations or pro-Beijing proxies at protests overseas, as in cases that have occurred since 2014 in the United States."[4]  As one specific example, in 2024, two agents of China were convicted of attempting to frame "U.S.-based practitioners of Falun Gong" with bogus tax charges through the IRS's Whistleblower Program to "strip the tax-exempt status of an entity run and maintained" by Falun Gong.[5]  More recently this year, the Government prosecuted an individual for operating an unauthorized police station through which the CCP could monitor and control dissidents, including Falun Gong followers.[6]

Media and cultural organizations affiliated with Falun Gong – like *The Epoch Times* – have long "reported suspicious break-ins targeting sensitive information, vehicle tampering, and pressure from Chinese authorities for local businesses to cut off advertising or other contractual obligations with them."[7]  Founded by Falun Gong practitioners in 2000, *The Epoch Times* – a media outlet highly critical of CCP rule – has been a primary target of CCP attacks.  Since its inception, "the CCP has waged a nonstop campaign to totally destroy" *The Epoch Times* by "threaten[ing] the newspaper's advertisers, … launch[ing] incessant cyberattacks on its website and IT systems, and threaten[ing] relatives of staff members back in China."[8]  The publication's

---

[4]    *China: Transnational Repression Origin Country Case Study*, Freedom House, 2021, available at: https://freedomhouse.org/report/transnational-repression/china

[5]    *California Man Sentenced For Acting As An Illegal Agent Of The PRC Government And Bribery*, Dep't of Justice, Nov. 19, 2024, available at: https://www.justice.gov/usao-sdny/pr/california-man-sentenced-acting-illegal-agent-prc-government-and-bribery.

[6]    *Man Convicted of Running Illegal Police Station Tied to China's Government*, Santul Nerkar, The N.Y. Times, May 13, 2026, available at: https://www.nytimes.com/2026/05/13/nyregion/china-covert-police-nyc-verdict.html.

[7]    *Id*.

[8]    U.S. House of Representatives, Congressional Record, H3485, July 13, 2023, Rep. Ralph Norman (S.C.), available at: https://www.congress.gov/118/crec/2023/07/13/169/120/CREC-2023-07-13-pt1-PgH3485.pdf; *see also Falun Gong and China's Continuing War on Human Rights*, Joint Hearing of the Comm. on Int'l Relations, U.S. House of Representatives, 109th Congress, July 21, 2005, available at: https://www.govinfo.gov/content/pkg/CHRG-109hhrg22579/pdf/CHRG-109hhrg22579.pdf ("How 'The Epoch Times' Has Been Harassed" detailing that China's "harassment … has taken three main forms:  (1) the attempt to interfere with ordinary business activities … (2) the

senior executives – many of whom, Mr. Guan included, are dedicated Falun Gong adherents – have been tailed, harassed, and intimidated by PRC and CCP agents.[9]

Just a year ago, in March 2025, the Government charged ten Chinese nationals with a "years-long hacking scheme" that targeted *The Epoch Times*, among other religious and dissident groups.[10]  As the Government itself has acknowledged, these organizations were targeted because the Chinese government "considered them threatening to the rule of the Chinese Communist Party."  (*Id.*)  Shortly after the charges were announced, *The Epoch Times* separately confirmed that it "was a victim of the hacking campaign" underlying the Government's charges where the CCP's cyberattacks "temporarily shut down of the website of *The Epoch Times*," "compromised the email accounts of the newspaper's chief editor and a vice president," and leaked the "username and password of the administrator account of *The Epoch Times* website" so that CCP agents could identify the IP addresses and "locate dissidents in China" who had accessed the newspaper's websites.[11]

Mr. Guan personally has experienced the repressive tactics of the PRC, CCP, and their agents and proxies for nearly three decades.  In China, Mr. Guan was arrested, detained,

---

attempt to deprive *The Epoch Times* of advertising; (3) the attempt to pressure staff members of *The Epoch Times* by intimidating family members living in mainland China.").

[9]     *IFJ Condemns China's 'Brutal Vendetta' Against Independent Newspaper*, International Federation of Journalists, Mar. 1, 2006, available at: https://www.ifj.org/media-centre/news/detail/article/ifj-condemns-chinas-brutal-vendetta-against-independent-newspaper (recounting incidents "[i]n the last four weeks" where "Epochs Times staff members have been the target of a series of threats and harassment," including one in which "IT Chief Yuan Li was attacked in his home in Atlanta, Georgia, USA, and severely beaten by a gang of Chinese men who stole only his work-related computers."); *see also Journalist with The Epoch Times assaulted in Atlanta: the newspaper accuses Chinese authorities*, Reporters Without Borders, Feb. 14, 2006, available at: https://rsf.org/en/journalist-epoch-times-assaulted-atlanta-newspaper-accuses-chinese-authorities.

[10]     *10 Chinese Nationals Charged With Large-Scale Hacking of U.S. And International Victims On Behalf Of The Chinese Government*, Dep't of Justice, Mar. 4, 2025, available at: https://www.justice.gov/usao-sdny/pr/10-chinese-nationals-charged-large-scale-hacking-us-and-international-victims-behalf.

[11]     *US Charges 12 Chinese Hackers, Officials for Cyber Operation Whose Targets Included The Epoch Times*, The Epoch Times, Mar. 5, 2025, available at https://www.theepochtimes.com/china/us-sanctions-12-chinese-hackers-intelligence-officials-for-massive-hacking-campaign-5820500?src_src=RTNews&src_cmp=rtbreaking-2025-03-05-5&est=AAAAAAAAAAAAAAAZe8idhsN3MWYueFWnmJUCr12hUABKtJJc9sDetSfWYG%2F3mt%2FdxE%3D.

interrogated, and then deported to Canada by the CCP for his dedication to Falun Gong. After being deported, Mr. Guan believes he was targeted by the CCP for wiretapping and surveillance. His family members in China were routinely harassed and intimidated as a result of their association with him, and were soon forced to relinquish their own commitment to Falun Gong.

Over time, as Mr. Guan's resistance to the CCP and his devotion to Falun Gong has increased, the CCP has enhanced its repressive conduct against him. He believes that his calls both within the United States and to China were wiretapped routinely, and his car's tires have been slashed on multiple occasions. He further believes that his role as the CFO of *The Epoch Times* has only amplified the target on his back – with the CCP focusing on gathering comprehensive data and information about him, among other senior personnel, through wiretapping and other covert measures. Evidence confirming these activities would significantly bolster Mr. Guan's defense and the fundamental credibility of his claims with the jury.

## II.    Countermeasures by Falun Gong and *The Epoch Times* to Counteract the CCP

As a result of the PRC and CCP's near-pervasive and wide-ranging operations in the United States, Falun Gong practitioners and *The Epoch Times* employees like Mr. Guan are acutely aware that they are the targets of hostile, state-sponsored attacks. They understand that the CCP and its proxies are actively monitoring dissidents like themselves through clandestine means, including by hacking their online and financial accounts, wiretapping their phones, and tracking and interfering with their daily activities. And they recognize that to mitigate the risk of harm to themselves and their families, they must vigilantly and constantly undertake countermeasures to elude CCP surveillance.

To the uninitiated observer, these countermeasures may appear deceptive, furtive, unusual, and/or suspicious. But to those familiar with the CCP's tactics, Mr. Guan's precautionary measures are fully consistent with the aim of resisting and eluding the CCP's repressive activities.

10

For example, Falun Gong activists have utilized specific social media applications that "allow them to share links to videos or other content in a manner that does not trigger automated keyword filtering," and find that it is "safer and more efficient to obtain a large number of registered phone cards and devices, then use them to make simultaneous calls with automated recordings."[12] Additionally, practitioners have been urged "to move from place to place while mak[ing] . . . calls" to avoid being tracked by Chinese authorities through geolocation technology.[13] These are just some of the tactics that Mr. Guan and others within Falun Gong have utilized to foil CCP tracking.

Mr. Guan personally avoids discussing personal or sensitive matters over the phone for fear that the PRC and CCP are wiretapping his calls. Mr. Guan even has resorted to communicating by pen and paper instead of speaking out loud about important matters. In his financial affairs, he has opened multiple accounts at several banks to broaden *The Epoch Times'* ability to function without interference by the PRC and CCP.

## III. The Government's Charges and Expected Evidence Against Mr. Guan

The Government has charged Mr. Guan with conspiracy to commit money laundering and with bank fraud. To support its charges, the Government alleges that Mr. Guan engaged in illegal and suspicious conduct, like seeking to conceal the supposed unlawful origins of the alleged crime proceeds he supposedly laundered through thousands of layered transactions. (Indictment, Doc No. 4 at ¶¶ 3, 8.) And to prove those charges, the Government intends to present evidence that the funds were funneled through thousands of financial accounts which were opened to layer the transactions, and that Mr. Guan – when confronted with signs of fraud or money laundering –

---

[12]     *Falun Gong: Religious Freedom in China*, Sarah Cook, Freedom House, 2017, available at https://freedomhouse.org/report/2017/battle-china-spirit-falun-gong-religious-freedom#footnote9_cAb0FK5Ak0t8zqOTblmtGwTnriizXOMGP4KW0A7B0A_uolECqT1Z4m5.

[13]     *Id.*

acted suspiciously, providing bank representatives with false and misleading information or altogether ignoring those signs.  (*See* Gov't Opp. to Defs. Pretrial Motions, Doc. No. 104 at 13.)

### IV.    Mr. Guan's *Brady* Requests and the Government's Response

To refute the Government's theory and evidence that he acted suspiciously or otherwise exhibited consciousness of guilt, Mr. Guan seeks evidence in the Government's possession, custody, and control which demonstrates that, among other things, the PRC and CCP have routinely targeted him, members of Falun Gong, or other employees of *The Epoch Times* as part of their repression campaign.  Securing such evidence would allow Mr. Guan to present an alternative, innocent explanation to the jury as to the conduct that the Government has characterized as suspicious, and would – at a minimum – allow the jury to evaluate evidence bearing on Mr. Guan's state of mind, intent, and beliefs at the time of alleged conduct in question.

To that end, on June 1, 2026, Mr. Guan sent the Government a written request that it conduct a thorough search of the files of the federal agencies with whom the Government had investigated this case, and to produce the following evidence (whether in classified or unclassified form) (the "Requested Documents"):

    a. Surveillance, targeting, intercepting communications of, and interfering with the activities by Mr. Guan, his fellow Falun Gong practitioners in the United States, and his colleagues at *The Epoch Times*, by the CCP and its proxies.

    b. Counterintelligence activities and operations into Mr. Guan, his fellow Falun Gong practitioners in the United States, and his colleagues at *The Epoch Times* – including the monitoring, intercepting, and recording of their communications – by U.S law enforcement and intelligence agencies.

c.   Records, reports, and information collected by U.S. agencies regarding the CCP transnational repression campaign targeting Mr. Guan, Falun Gong, and *The Epoch Times*.

On June 9, 2026, the Government declined to produce – or even search for – the Requested Documents. The Government further asserted that it was not obligated to search the files of the various agencies involved in the investigation of this case asserting that they were not part of the prosecution team.

## ARGUMENT

### I.   The Requested Documents Are Material and Favorable to Mr. Guan's Defense.[14]

"The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Id*. (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). The materiality of evidence "turns on the cumulative effect of all such evidence suppressed by the government." *Kyles v. Whitley*, 514 U.S. 419, 421 (1995) (citation omitted). Thus, the Government is obligated to "gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Id*. at 437. Stated differently, evidence must be disclosed under *Brady* if it would "create[] a reasonable doubt that did not otherwise exist." *Orena v. United States*, 956 F. Supp. 1071, 1096 (E.D.N.Y. 1997). Ultimately, *Brady, Giglio*, and their progeny "recognize[] the

---

[14]    In its response to Mr. Guan's written demand for discovery, the Government complained that Mr. Guan's demand was untimely. But under the "Due Process Clause, the Government has a continuing obligation to provide *Brady* material," *United States v. McDow*, 206 F. Supp. 3d 829, 858 (S.D.N.Y. 2016), and this Court may "order *Brady/Giglio* disclosure at any time as a matter of sound case management." *United States v. Hwa*, 2021 WL 11723583, at *48 (E.D.N.Y. Sept. 3, 2021) (citations omitted).

13

possibility that the evidence on which the prosecution relies to prove the defendant's guilt is not necessarily truthful, accurate, or complete, especially when the prosecution's investigations have made it aware of evidence or information that might be favorable to the defense in controverting the Government's proofs." *United States v. Rodriguez,* 496 F.3d 221, 225 (2d Cir. 2007).

The Government's *Brady* duty extends to learning about "any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. The Government must search "sources that are readily available … and that, because of the known facts and nature of the case, should be searched as a function of fairness to the defendant," including sources within the U.S. intelligence community (Justice Manual § 2052(B)(2)) or at other federal agencies outside of the U.S. Attorney's Office.[15]

The Requested Documents constitute a textbook example of *Brady* or *Giglio* evidence that are not only material and favorable to Mr. Guan's defense, but which are exculpatory, because they potentially vitiate essential elements of the money laundering conspiracy and bank fraud charges at issue in this case:  knowledge and intent. *See United States v. Huezo*, 546 F.3d 174, 181 (2d Cir. 2008) (money laundering conspiracy conviction requires "inference that [defendant] knew about the conspiracy and acted with the specific intent to participate in it for the purpose of concealing or disguising" funds derived from unlawful activity); *United States v. Wider*, 184 F. Supp. 3d 10, 16 (E.D.N.Y. 2016) (bank fraud conviction requires evidence of intent to "deceive a federally chartered or insured financial institution into releasing property" and "victimize the

---

[15]    To the extent any such information is classified, the Second Circuit has adopted a more permissive standard than *Brady* mandating disclosure if the information is "relevant and helpful to the defense of an accused." *United States v. Aref*, 533 F.3d 72, 79 (2d Cir. 2008) (such evidence "need not rise to the level that would trigger the Government's obligation under *Brady* … to disclose exculpatory information" – it "can be helpful without being 'favorable' in the *Brady* sense"). The Government should de-classify any such information, or immediately produce it in classified form to Mr. Guan's counsel – Ann St. Peter-Griffith – who has the requisite security clearance to receive materials pursuant to the Classified Information Procedures Act (CIPA), as well as to any other counsel who are subsequently cleared. To the extent there is classified information at issue here, Mr. Guan joins in the Motion for Classified-Materials Review Under CIPA § 4 of his co-defendant, Le Van Hung. (*See* Doc. No. 156.)

14

institution by exposing it to actual or potential loss").  While the Government intends to present circumstantial evidence in the form of "acts that exhibit a consciousness of guilt," *United States v. Serrano*, 224 F. Supp. 3d 248, 254 (S.D.N.Y. 2016), Mr. Guan should be entitled to refute the Government's narrative with evidence that he harbored "an honest belief" behind the alleged misconduct, *United States v. Hamilton*, 3 F. App'x 7, 10 (2d Cir. 2001), because the "objective reasonableness of a claimed belief may be probative of whether [Mr. Guan] held the belief in good faith."  *United States v. Weber*, 843 F. App'x 364, 367 (2d Cir. 2021).

Evidence that the PRC and CCP targeted Mr. Guan or the Falun Gong community and *The Epoch Times* executives directly undercuts the Government's narrative that Mr. Guan knowingly engaged in suspicious conduct to evade detection by U.S. banking and law enforcement authorities.  To Mr. Guan and other Falun Gong practitioners, the PRC and CCP's interference in their affairs has overtaken – and largely dictated – the way in which they conduct their daily personal, professional, financial, and online lives.  Every decision that Mr. Guan has made for the past thirty years of his life has factored the insidious risk that the PRC and CCP are watching and seeking to interfere with his communications and other affairs.  Thus, evidence of CCP targeting is highly material to explaining Mr. Guan's contemporaneous knowledge, beliefs, and intent at the time that he engaged in the conduct that the Government claims is highly suspicious.  This evidence plainly explains the reason behind Mr. Guan's decision to open multiple financial accounts and enter into myriad transactions which the Government contends is evidence of "layering," or why he allegedly misled bank representatives about the nature or purpose of these transactions.

Evidence of CCP targeting will demonstrate that Mr. Guan engaged in this conduct *not* because he knew the transferred funds were criminal proceeds – or that he tried to conceal their

unlawful origins – but rather because he genuinely believed doing so would allow him elude, evade, and obfuscate the CCP's efforts to track his activities.  The fact that the CCP's transnational campaign has sought to infiltrate the financial accounts of dissidents – and interfere with the relationship between dissidents and their bankers – is well-known.[16]  And this fact – among other CCP-related repression tactics – bears directly on Mr. Guan's motivations, beliefs, knowledge, and state of mind during the relevant period of the charged conduct.  The CCP's repression tactics undoubtedly have influenced Mr. Guan's decisions over his financial affairs in ways that would not have affected the average person. The discovery Mr. Guan seeks therefore is powerful exculpatory evidence that will provide the jury with an "alternative, non-culpable explanation" concerning why Mr. Guan engaged in certain measures "not for the purpose of evading U.S. authorities, but as a necessary by-product of" the CCP's repression campaign and "to avoid the Chinese government's efforts to interfere with his accounts."  *United States v. Kwok*, 2024 WL 732109, at *4 (S.D.N.Y. Feb. 21, 2024) (alterations omitted).  And, it "lend[s] credence" to Mr. Guan's innocent belief behind opening and managing hundreds of financial accounts.  *United States v. Rittweger*, 524 F.3d 171, 181 (2d Cir. 2008); *see also United States v. Percoco*, 2017 WL 6314146, at *23 (S.D.N.Y. Dec. 11, 2017) (directing disclosure of *Brady* information "that speaks to [defendant's] belief or understanding" as to appropriateness of particular conduct).

The *Kwok* case, which was prosecuted in this district, is highly instructive and on-point. In *Kwok*, the Court directed the Government to disclose "evidence related to the CCP's targeting" of the defendant, "his family, his co-defendants, and the corporate entities relevant to the indictment."  2024 WL 732109, at *3 (alteration omitted).  In doing so, the Court credited Kwok's

---

[16]    William Zheng, *'Beijing blocked my bank accounts': Chinese dissident in US says Communist Party froze his life savings*, South China Morning Post, Nov. 19, 2020, available at: https://finance.yahoo.com/news/beijing-blocked-bank-accounts-chinese-093000123.html.

16

argument – the very same argument which Mr. Guan has articulated here – that such evidence "provides an alternative, nonculpable explanation" for the defendant's ostensibly suspicious conduct, and that he "believed in good faith that" engaging in such conduct was "appropriate and nonfraudulent" – which was a "defense to the fraud charges" in that case. *Id*.

While the *Kwok* court directed the disclosure of these materials pursuant to Rule 16, which presents a "relatively low bar of materiality" rather than under *Brady*, *Kwok*, 2024 WL 732109, at *4 n.2, this Court too should order the disclosure of the Requested Documents for two very important reasons. *First*, as demonstrated beyond cavil in this motion, the Requested Documents are material and tend to exculpate Mr. Guan and/or can be used to impeach witnesses, so they must be disclosed pursuant to *Brady* and *Giglio*.

*Second*, even if this Court finds that the Requested Documents are Rule 16 material rather than *Brady* or *Giglio* material – which it should not – then *in the interests of justice and so that one innocent person doesn't suffer*, this Court should direct the disclosure pursuant to Rule 16 – even if the time for Rule 16 motions has passed. Indeed, the prosecutors' argument that this Court should deny Mr. Guan access to such potentially critical evidence that would demonstrate his innocence – based solely on the fact that the time for Rule 16 motions has passed – is precisely the kind of "foul [blow]" that the Supreme Court in *Berger v. United States* held a prosecutor is not "at liberty to strike," and is antithetical to Supreme Court's admonition in *Berger* that "[t]he United States Attorney is the representative . . . of a sovereignty. . . whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds*, *Stirone v. United States*, 361 U.S. 212 (1960).

Finally, evidence that U.S. authorities monitored Mr. Guan and other dissidents targeted by the CCP as part of their own counterintelligence operations – and related records and briefings

detailing what U.S. authorities learned from such operations – is equally powerful and material evidence for Mr. Guan's defense.  At a fundamental level, this evidence would confirm that Mr. Guan's "fears of CCP targeting [were] objectively legitimate," which could be "used to counter the Government's case or to bolster his defense."  *Id*. (citing *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)).  Moreover, it would "furnish an explanation of the understanding or intent with which certain acts were performed," and render Mr. Guan's innocent belief and knowledge underlying his alleged conduct more credible in the eyes of the jury.  *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).

## II.    The "Prosecution Team" Includes Federal Agencies That Possess and Have Knowledge of the Requested Documents

The *Brady* obligation covers "material evidence [] that is known to the prosecutor."  *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).  A "prosecutor is presumed to have knowledge of all information gathered in connection with his office's investigation of the case and indeed has a duty to learn of any favorable evidence known to [] others acting on the government's behalf in the case, including the police."  *Id*. (citing *Kyles*, 514 U.S. at 437).  The knowledge of the prosecutor "extends to those individuals who are an 'arm of the prosecutor' or part of the 'prosecution team.'"  *United States v. Meregildo*, 920 F. Supp. 2d 434, 440–41 (quoting *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002)).  Such individuals include those at agencies that are "so closely aligned with the prosecution so as to be considered part of the 'prosecution team.'"  *United States v. Chalmers*, 410 F. Supp. 2d 278, 290 (S.D.N.Y. 2006).

Where a prosecutor "conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence."  *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012).  A refusal to disclose evidence because "another agency, not the [U.S.

18

Attorney's Office], is in actual possession of the documents created or obtained as part of the joint investigation is both hypertechnical and unrealistic." *Id*. (quotation and citation omitted). "For *Brady* purposes, it is enough that the agencies are ***engaged in joint fact-gathering***, ***even if they are making separate investigatory or charging decisions***, because the purpose of *Brady* is to apprise the defendant of exculpatory evidence obtained during the fact-finding that might not otherwise be available to the defendant." *Id*. at 494 (emphasis added). And "***how the agencies use the facts discovered jointly is irrelevant, and the joint investigation need not result in a joint prosecution***." *Id*. at 494-95 (emphasis added). The law is clear: in a joint investigation with another agency, the "Government is charged with reviewing all documents and information connected to that joint investigation and disclosing any exculpatory information." *Id*. at 495 (emphasis added).

Here, the U.S. Attorney's Office – **by its own admission** – unquestionably engaged in joint-fact gathering with various other federal agencies, including the U.S. Department of Labor's Office of Inspector General ("DOL-OIG"), the U.S. Department of State's Diplomatic Security Service ("DSS") Domestic Operations, and U.S. Customs and Border Protection ("CBP"). The "official press release[] in this case made clear that at least [three] *federal* agencies must be deemed 'agents' involved in the investigation for *Brady* purposes." *United States v. Cerna*, 633 F. Supp. 2d 1053, 1059 (N.D. Cal. 2009) (holding that ICE, DEA, FBI, and ATF were agents of the prosecution's investigation based on language of press release).

Indeed, it was the U.S. Attorney's Office itself which publicly touted in its press release that DOL-OIG "investigate[d] allegations of fraud involving the U.S. Department of Labor's unemployment insurance program," and DSS utilized its "expansive global reach" and "capacity to collaborate effectively with both U.S. and international law enforcement agencies on complex

19

transnational cases," "tirelessly working to conduct investigations of this nature daily around the world."[17]  For their efforts, the then-U.S. Attorney "praised the ***outstanding investigative work*** of DOL-OIG, DSS, and the Special Agents of the U.S. Attorney's Office for the Southern District of New York" while also thanking "the U.S. Customs and Border Protection for its valuable assistance."[18]

Moreover, the plain language of the press release makes explicit that this case is the result of a "prosecutor-led, intelligence-driven, multi-agency approach"[19] through the Organized Crime Drug Enforcement Task Force ("OCDETF").  This multi-agency approach necessarily required and involved a "degree of cooperation between the agencies . . . investigating the facts of the case." *See United States v. Martoma*, 990 F. Supp. 2d 458, 461 (2014).

Additionally, nearly a year-and-a-half after issuing that press release, the Government confirmed the important role these agencies played in its investigation and prosecution of Mr. Guan, representing to this Court that "[f]rom February 2021 through the present, ***the case has been investigated by, and ultimately charged with the assistance of, the following investigating agencies:***  the U.S. Attorney's Office for the Southern District of New York ('USAO-SDNY'), the U.S. Department of Labor's Office of Inspector General ('DOL-OIG'), and the U.S. Department of State's Diplomatic Security Service ('DSS')."  (Gov't Opposition to Defs. Pretrial Motions, Doc. No. 104 at 8 (emphasis added).)  Thus, knowledge of agents in DOL-OIG, DSS, and CBP must be imputed to the U.S. Attorney's Office in light of the Government's clear public admissions and previous explicit representations to this Court that these agencies jointly

---

[17]     *Chief Financial Officer Of Multinational Media Company Charged With Participating In Scheme To Launder At Least $67 Million In Fraud Proceeds*, Dep't of Justice, June 3, 2004, available at: https://www.justice.gov/usao-sdny/pr/chief-financial-officer-multinational-media-company-charged-participating-scheme.

[18]     *Id*.

[19]     *Id*.

20

investigated by Mr. Guan and as a result of their "outstanding investigative work," he was "ultimately charged with [their] assistance."[20]

Additionally, there are other OCDETF agencies whose involvement in the investigation and assistance to the prosecutors – while not explicitly referenced in the press release and prior Government filings – remain an open question.[21]  The Government should explain whether the dozens of other OCDETF agencies beyond DOL-OIG, DSS, and CBP also were involved in the joint investigation of this case.  These include the Bureau of Alcohol, Tobacco, Firearms and Explosives; Drug Enforcement Administration; Federal Bureau of Investigation; U.S. Marshals Service; Immigration and Customs Enforcement, Homeland Security Investigations; U.S. Coast Guard; U.S. Secret Service; Internal Revenue Service, Criminal Investigations; Postal Inspection Service; and other State and Local Law Enforcement Agencies.[22]

As courts in this district have made clear, a prosecution team may be composed of "many members with different responsibilities" ranging from "perform[ing] investigative duties and mak[ing] strategic decisions about the prosecution of the case."  *Meregildo*, 920 F. Supp. 2d at 441.  Individuals may qualify for the prosecution team *even if* they are "not strategic decision-makers," but instead "submit to the direction of the prosecutor and aid in the Government's investigation."  *Id*.  Under a "totality of the circumstances, the more involved individuals are with the prosecutor, the more likely they are team members."[23]  *Id*. (whether an individual "actively

---

20        *Id.*
21        *Id*.
22        About OCDETF, Dep't of Justice, available at: https://www.justice.gov/archives/ocdetf/about-ocdetf.
23        While no single factor is the touchstone for imputing the knowledge of a federal agency to the prosecutor, some courts have considered a series of non-exhaustive factors concerning whether the agency:  "(1) participated in the prosecution's witness interviews; (2) was involved in presenting the case to the grand jury; (3) reviewed documents gathered by or shared documents with the prosecution; (4) played a role in the development of prosecutorial strategy; or (5) accompanied the prosecution to court proceedings."  *United States v. Middendorf*, 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018).  Given the U.S. Attorney's explicit recognition of their "investigative work in this case, they "reviewed documents gathered by or shared documents with the prosecution."  *Id*.  And their involvement in announcing the charges against Mr. Guan – through a press release highlighting their prominent role in the case –

investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy" is relevant to inquiry).  Thus, given that this was an OCDETF "operation," there may well be a panoply of other agencies at the federal, state, and local level – and within both the law enforcement and intelligence communities – that were involved to such an extent that their assigned agents would qualify as members of the prosecution team.

But the Government's flippant response to Mr. Guan's request – particularly in light of the consequential *Brady* and *Giglio* implications of non-disclosure – is unserious.  The prosecutors refuse to confirm or deny whether they "[are] or [are] not aware of any such alleged *Brady* or *Giglio* material" (*see* Gov't Response Letter, Doc. No. at 157–3 (Ex. C) at 1 n.1)*,* disavow that any agency – including DOL-OIG, DSS, and CBP – jointly participated in the investigation as part of the prosecution team, and assert that – even if they were aware of *Brady* and *Giglio* information at these other agencies – they would not have to produce it because it is "outside the possession, custody or control of the prosecution team."  (*Id.* at 4 n.3)  Nor have the prosecutors even committed to asking even *some* of the OCDETF agencies to search their files, instead opting to categorically stonewall Mr. Guan's requests.

And perhaps even worse, the Government makes and renders all these unqualified and uncategorical statements and representations – without any indication whatsoever that these absolutist representations are based on thorough, diligent and legally sufficient searches of DOJ's own files (including those of FBI counterintelligence and other DOJ components) – let alone those of the other departments and agencies that participated in this OCDETF investigation and prosecution.  Indeed, and to the contrary, it appears that these formal written representations to the

---

demonstrates that they "played a role in the development of prosecutorial strategy."  *Id.*  In view of the active role that several federal agencies assumed in the underlying investigation, the Government should be directed to provide more information about their involvement and responsibilities so that this Court can determine whether the other factors apply here.

parties are based on no searches, inquiries, or diligence by the Government whatsoever.  And as such, they should not be given any weight.

At an absolute minimum, given (i) the highly material and exculpatory nature of the Requested Documents, (ii) the Government's previous admissions regarding a multi-agency investigative effort, and (iii) the particularly grave consequences of withholding *Brady* or *Giglio* materials, this Court should order the Government to search for and to separately disclose immediately to Mr. Guan and the Court, with specificity, the nature and extent of its communications with and information shared by DOL-OIG, DSS, CPB, and any other OCDETF agency with whom it has jointly investigated this case so that this Court can properly ascertain their role in the investigation and determine whether all, some, or none of these agencies were part of the prosecution team.  *See United States v. Alexandre*, 2022 WL 16798756, at \*4 (S.D.N.Y. Nov. 8, 2022) (directing Government to submit affidavits "describing with specificity the nature and extent of the prosecutors' … relationship with [other federal agencies] during their investigations of the Defendant," including "nature of all communications" and extent of information shared).  And also to determine if the Government's representations to the parties and to the Court are based on adequate, comprehensive, diligent, and legally sufficient requests and searches, both inside and outside DOJ.

## CONCLUSION

For the foregoing reasons, Defendant Weidong Guan respectfully requests that this Court grant his Motion to Compel, and direct the Government to search for and produce: (1) surveillance, interference, and targeting of Mr. Guan, the Falun Gong community, and *The Epoch Times* employees by the People's Republic of China, the Chinese Communist Party, and their agents and proxies; (2) counter-surveillance and counter-intelligence efforts by U.S. agencies into Mr. Guan, the Falun Gong community, and *The Epoch Times* and its executives and employees; and

(3) intelligence and counterintelligence gathered, obtained, and possessed by U.S. agencies into transnational repression activities targeting Mr. Guan, Falun Gong, or *The Epoch Times* and its executives and employees by the People's Republic of China, Chinese Communist Party, and their agents and proxies.

Dated:  June 16, 2026
        New York, New York

KASOWITZ LLP

*/s/ Edward E. McNally*
Edward E. McNally
Daniel J. Fetterman
Ann M. St. Peter-Griffith (*pro hac vice*)
Brian S. Choi

1633 Broadway
New York, New York 10019
Tel.:  (212) 506-1700
Email:  emcnally@kasowitz.com
        dfetterman@kasowitz.com
        astpetergriffith@kasowitz.com
        bchoi@kasowitz.com

PETRILLO KLEIN + BOXER LLP

Guy Petrillo
Kevin R. Puvalowski
Marcelo Triana
Shanice Hinckson

655 Third Avenue, 12th Floor
New York, New York 10017
Tel.:  (212) 370-0332
Email:  gpetrillo@pkbllp.com
        kpuvalowski@pkbllp.com
        mtriana@pkbllp.com
        shinckson@pkbllp.com

24