UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                        :

UNITED STATES OF AMERICA           :

                             :

          -*v.*-                   :          24 Cr. 322 (VM)

                             :

WEIDONG GUAN,               :
   a/k/a "Bill Guan," and      :
LE VAN HUNG,                :
   a/k/a "Hung Van Le,"       :
   a/k/a "Van Hung Le,"       :

                             :

                Defendants.    :

                             :
------------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT HUNG'S MOTION FOR <u>PROTECTIVE RELIEF REGARDING PRIVILEGE ASSERTIONS</u>

                                              JAY CLAYTON
                                              United States Attorney

Benjamin M. Burkett
Rebecca T. Dell
Paul M. Monteleoni
Amanda C. Weingarten
Assistant United States Attorneys

- Of Counsel -

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ........................................................................................................ 1

    A.    The Filter Review .................................................................................. 1

    B.    The Production of the Screened Documents and the Non-Screened Documents... 2

    C.    The Post-Production Preliminary Review of the Non-Screened Documents ......... 4

    D.    The First Privilege Assertions................................................................. 5

    E.    The Second Privilege Assertions ............................................................ 6

ARGUMENT.............................................................................................................. 8

I.    The Defendant Is Not Entitled to Discovery or a Hearing...................................... 8

    A.    Applicable Law..................................................................................... 8

    B.    Discussion........................................................................................... 11

        1.    The Government's Use of a Filter Team Member Was Entirely Proper and Consistent with Established Procedures in this District ........................... 12

        2.    Hung Is Not Entitled to Details About the Filter Review Process............ 15

        3.    Hung Has Not Established an Intentional Intrusion Into Privileged Materials ..................................................................................... 18

        4.    Hung Has Failed to Sufficiently Articulate Any Prejudice ..................... 24

        5.    The Defendant Is Not Entitled to the Extraordinary Remedies of Dismissal of The Indictment or Disqualification of the Prosecution Team .............. 30

CONCLUSION.......................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................................... 17

*Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951) ............................................. 22

*In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006) ........................................ 24

*In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55 (S.D.N.Y. 1994) ...................................................................................................................... 14

*In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021) ............................................................... 9, 13, 14

*Montejo v. Louisiana*, 556 U.S. 778 (2009) ................................................................... 9

*Pursley v. City of Rockford*, No. 18 Civ. 50040, 2020 WL 1433827 (N.D. Ill. Mar. 24, 2020) .. 29

*Pursley v. City of Rockford*, No. 18 Civ. 50040, 2020 WL 4815946 (N.D. Ill. Aug. 19, 2020) .. 29

*von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987)……………………….7

*United States v. Abdel Sattar*, No. 02 Cr. 0395 (JGK), 2002 WL 1836755 (S.D.N.Y. Aug. 12, 2002) ...................................................................................................................... 8

*United States v. Armstrong*, 517 U.S. 456 (1996) ....................................................... 15

*United States v. Avenatti*, 559 F. Supp. 3d 274 (S.D.N.Y. 2021) ............................. 9, 24

*United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) .. 9, 14

*United States v. Blau*, 159 F.3d 68 (2d Cir. 1998) ...................................................... 10

*United States v. Ceglia*, No. 12 CR 876 (VSB), 2015 WL 1499194 (S.D.N.Y. March 30, 2015) 9, 14

*United States v. Collins*, 409 F. Supp. 3d 228 (S.D.N.Y. 2019) .................................. 17

*United States v. Combs*, No. 24 Cr. 542 (AS) (S.D.N.Y.) ....................................... 12, 13

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ..................................... 11, 31

*United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011) ................................... 8

*United States v. Gartner*, 518 F.2d 633 (2d Cir. 1975) .......................................... 11, 21

*United States v. Ginsberg*, 758 F.2d 823 (2d Cir. 1985) .............................................. 24

*United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025) ............................................ 24

*United States v. Helmsley*, 726 F. Supp. 929 (S.D.N.Y. 1989) ................................... 10

*United States v. Hoey*, 725 F. App'x 58 (2d Cir. 2018) ............................................... 10

ii

*United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871 (S.D.N.Y. Jan. 21, 2016) .. 10, 26

*United States v. Horn*, 29 F.3d 754 (1st Cir. 1994) ........................................................................ 30

*United States v. Horn*, 811 F. Supp. 739 (D.N.H. 1992) ................................................................ 30

*United States v. Hunter*, 32 F.4th 22 (2d Cir. 2022) ...................................................................... 15

*United States v. Landji*, No. S1 18 Cr. 601 (PGG), 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) .................................................................................................................................................. 23, 25

*United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016) 11, 31

*United States v. Lusterino*, 450 F.2d 572 (2d Cir. 1971) ................................................................ 22

*United States v. Madoch*, 149 F.3d 596 (7th Cir. 1998) ........................................................... 28, 29

*United States v. Mejia*, 655 F.3d 126 (2d Cir. 2011) ................................................................ 28, 29

*United States v. Milton*, No. 21 Cr. 478 (ER) (S.D.N.Y. Sept. 8, 2022) ......................... 10, 17, 25

*United States v. Neill*, 952 F. Supp. 834 (S.D.N.Y. 1997) ............................................................. 25

*United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017)  11, 31

*United States v. Pugh,* 162 F. Supp. 3d 97 (E.D.N.Y. 2016) ........................................................ 27

*United States v. Pugh*, 937 F.3d 108 (2d Cir. 2019) ...................................................................... 27

*United States v. Pugh*, 945 F.3d 9 (2d Cir. 2019) .......................................................................... 27

*United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972) ..................................................................... 22

*United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994 (S.D.N.Y. Oct. 18, 2019) . 11, 31

*United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989) ........................................................... 28

*United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991) .................................................... passim

*United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) 10, 11, 23, 31

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) .................................................................. 15

*United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776 (S.D.N.Y. Aug. 15, 2023) .................................................................................................................................................. 23

*United States v. Walker*, 243 F. App'x 621, 623 (2d Cir. 2007) .................................................... 30

*United States v. Weigand*, 482 F. Supp. 3d 224 (S.D.N.Y. 2020) .......................................... 10, 16

*United States v. Wilson*, 505 F. Supp. 3d 3 (D. Mass. 2020) ........................................................ 27

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ............................................................... 9, 24

*United States v. Zeitlin*, No. 23 Cr. 419 (LAK), (S.D.N.Y. Nov. 27, 2023) ............................. 9, 14

**<u>Rules</u>**

Fed. R. Crim. P. 16(a)(2) ................................................................................................ 15

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to defendant Le Van Hung's motions for an evidentiary hearing and other relief related to the Government's May 29, 2026 discovery production.  (Dkts. 153-55, 172).[1]  The defendant seeks extraordinary relief that is legally unsupported and premised on factually inaccurate assertions.  His motions should be denied.

**BACKGROUND**

The defendant's motions arise from a production of scans of hardcopy foreign-language documents that the Government took care, under established practices, to screen for any possible privilege, and that in any event, concerns foreign-language text of which no member of the prosecution team has any ability to comprehend, through any form of translation or otherwise.

**A.    The Filter Review**

In preparing for trial, as is common, the Government has continued to review its files and identified certain documents that had not previously been produced in discovery.  Consistent with the Government's general practice in this District, irrespective of whether those documents fell within the Government's discovery obligations, to the extent potentially relevant, the Government prepared to produce the documents.  Before they were reviewed by the Government or produced to the defendants, a filter team member, who was and is not part of the prosecution team, reviewed the documents to determine whether any were potentially privileged.  Those documents were ultimately marked with control numbers USAO_HUNG_00000037 through

---

[1] Citations to "Dkt." refer to docket entries in this case; citations to "Initial Mot." refer to the memorandum of law submitted in connection with Hung's first motion (Dkts. 153-55); and citations to "Supp. Mot." refer to the memorandum of law submitted in connection with Hung's supplemental motion (Dkt. 172).

USAO_HUNG_00000275 (collectively, the "Screened Documents"), and USAO_00628089 through USAO_00628644 (collectively, the "Non-Screened Documents"). The Screened Documents were identified as potentially privileged and segregated from the prosecution team.

### B.    The Production of the Screened Documents and the Non-Screened Documents

On May 29, 2026, the Government made a discovery production to both defendants (the "May 29 Production"). Consistent with every prior production since the inception of this investigation, as a courtesy, the Government included a cover letter identifying the documents being produced. To defendant Weidong "Bill" Guan, the May 29 Production cover letter (the "Guan Cover Letter") contained one sentence: "Based on your request for discovery in this case, and pursuant to the Protective Order entered on June 24, 2024 (Dkt. No. 20), we have enclosed copies of the materials which are described in the attached index and which are stamped with control numbers USAO_00628067 through USAO_00628644."

The Guan Cover Letter was accompanied by the below index:

| United States v. Weidong Guan, a/k/a "Bill Guan," 24 Cr. 322 (VM) | | | |
|---|---|---|---|
| Discovery Production Index | | | |
| INDEX - SUBJECT TO THE PROTECTIVE ORDER - SEALED | | | |
| Production 39 (05/29/2026) | | | |
| Bates Start | Bates End | Summary Description | Protective Order Designation |
| Global Discovery | | | |
| USAO_00628067 | USAO_00628085 | Translations | Sealed |
| USAO_00628086 | USAO_00628088 | Certifications of Records | Disclosure Material |
| USAO_00628089 | USAO_00628644 | Le Van Hung Documents | Sealed |

To defendant Le Van Hung, the May 29 Production cover letter (the "Hung Cover Letter") contained three sentences:

> Based on your request for discovery in this case, and pursuant to the Protective Order entered on November 25, 2024 (Dkt. No. 36), we have enclosed copies of the materials which are described in the attached index and which are stamped with control numbers USAO_00628067 through USAO_00628644 and USAO_HUNG_00000037 through USAO_HUNG_00000275.

2

> The documents being produced to you at USAO_HUNG_00000037 through USAO_HUNG_00000275 have been segregated from the prosecution team as potentially privileged. Please let us know by June 8, 2026 if you intend to assert privilege over these documents, and, if you do, please provide a privilege log.

(Dkt. 154-2).

The Hung Cover Letter was accompanied by the below index:

| United States v. Le Van Hung, S1 24 Cr. 322 (VM) | | | |
|---|---|---|---|
| Discovery Production Index | | | |
| INDEX - SUBJECT TO THE PROTECTIVE ORDER - SEALED | | | |
| Production 32 (05/29/2026) | | | |
| Bates Start | Bates End | Summary Description | Protective Order Designation |
| Global Discovery | | | |
| USAO_00628067 | USAO_00628085 | Translations | Sealed |
| USAO_00628086 | USAO_00628088 | Certifications of Records | Disclosure Material |
| USAO_00628089 | USAO_00628644 | Le Van Hung Documents | Sealed |
| Individual Discovery | | | |
| USAO_HUNG_00000037 | USAO_HUNG_00000275 | Potentially Privileged Le Van Hung Documents | Sealed |

On May 29, 2026, the Government sent two separate emails with two separate USAfx links (*i.e.*, links to the Department of Justice's secure file-sharing platform) containing the two separate productions, one to counsel for Guan, and the other to counsel for Hung, *i.e.*, the May 29 Production. As noted in the three-sentence Hung Cover Letter and accompanying index, the Government produced to Hung documents that had "been segregated from the prosecution team as potentially privileged," *i.e.*, the "Screened Documents," which were listed as "Individual Discovery." (Dkt. 154-2).[2] The Government produced the Non-Screened Documents—the documents that the filter team member designated as not potentially privileged—to both defendants. Guan did not receive the Screened Documents and the prosecution team did not access the Screened Documents.

---

[2] Despite the fact that the Government also asked counsel for Hung to "[p]lease let us know by June 8, 2026 if you intend to assert privilege over these documents and, if you do, please provide a privilege log," *id.*, Hung did not assert privilege over the Screened Documents until his June 19, 2026 blanket assertion of privilege, and he has still not explained the basis for his assertion of privilege over the Screened Documents.

C.      The Post-Production Preliminary Review of the Non-Screened Documents

Following the production, a non-Vietnamese-speaking and non-Korean-speaking member of the prosecution team (the "Team Member") looked at the Non-Screened Documents, consistent with the fact that they had been determined by the filter team member not to be potentially privileged and Hung had not to date identified as privileged.  In doing so, the Team Member noticed that certain of the Non-Screened documents, specifically those with Bates Ranges USAO_00628118-00628140,  USAO_00628244-00628277,  and  USAO_00628278-00268398, appeared to list dates that post-dated Hung's arrest, which led the Team Member to decide not to review the documents further and instead expressly ask counsel for Hung whether counsel was asserting the documents within those Bates Ranges were privileged, notwithstanding the filter team member's finding that they were not potentially privileged.  The Team Member (like every other member of the prosecution team) did not use any human or machine-translation tools—including any AI assisted translation tools—to review *any* of the Non-Screened Documents, including the documents listed in the Bates Ranges above, and does not know the foreign-language content of the documents.  And that remains the case.

On May 31, 2026, the Government emailed counsel for both defendants stating that the May 29 Production contained documents "within a folder called 'Le Van Hung Documents'" and that the documents within the Bates Ranges listed above "are in a foreign language, and, although we have not translated them or read their contents, they appear that they may contain information from after Hung's arrest." (Dkt. 154-4).  Accordingly, the Government requested that, "[i]n an abundance of caution, we'd like counsel for Hung to confirm that there is nothing privileged in these documents" and that "[c]ounsel for Guan . . . not look at these documents until we have heard back" from counsel for Hung and further confirmed that "[w]e [that is, the prosecution team] will

also not look at the documents in the interim." (*Id.*).

D.      **The First Privilege Assertions**

On June 3, 2026, counsel for Hung sent a letter to the Government and counsel for Guan asserting privilege over the Non-Screened Documents listed at the Bates Ranges listed above, *i.e.*, the "First Set of Assertedly Privileged Documents," and expressing alleged "serious concern" regarding the handling of the documents. (Dkt. 154-5, the "June 3 Letter").[3]

On June 6, 2026, the Government informed counsel for Hung that it had "segregated [the First Set of Assertedly Privileged Documents] from the prosecution team," (Dkt. 154-6 at 1 (the "June 6 Letter")) and corrected Hung's incorrect assumptions regarding the prosecution team's handling of the First Set of Assertedly Privileged Documents:

> The Government used a filter team member (not part of the prosecution team) to conduct an initial privilege screen of the documents that were ultimately marked with control numbers USAO_HUNG_00000037 through USAO_HUNG_00000275 (the "Screened Documents"), and USAO_00628089 through USAO_00628644 (the "Non-Screened Documents"). The Screened Documents were identified as potentially privileged, segregated from the prosecution team, and produced only to you. The Non-Screened Documents were not identified as potentially privileged and were produced to you and counsel for the codefendant. Although the prosecution team had access to the Non-Screened Documents (including the [First Set of] Assertedly Privileged Documents) following the filter review, **it did not human translate, machine translate, or otherwise cause any member of the prosecution team to become aware of the contents of the Vietnamese or Korean text contained within them**, as opposed to

---

[3] Although Hung claimed that the First Set of Assertedly Privileged Documents "are privileged in their entirety" (June 3 Letter at 1), Hung did not, and has not, explained how the limited non-foreign language portions of the First Set of Assertedly Privileged Documents that the Government observed, namely the dates, isolated handwritten English language words, and formatting of the documents, are privileged. Rather, Hung has argued that the documents contain confidential communications between Hung and his wife who passed on legal advice to Hung from his lawyers. (*Id.* at 1-4).

their general appearance and features such as the numbers and isolated English words contained within them. In an attempt to determine which of the Non-Screened Documents to prioritize for review, a non-Vietnamese-speaking and non-Korean-speaking member of the prosecution team looked at the Non-Screened Documents. In doing so, the prosecution team member noticed basic attributes of the documents and facts that appeared on the face of the documents—*e.g.*, formatting of the documents; which language the documents appeared to be written in; images, isolated handwritten English language words, hyperlinks, or email addresses; and numbers, including apparent dates. **The prosecution team member did not (and could not) read the Korean and Vietnamese text on the documents, nor did the prosecution team member use machine translation tools to do so or consult with someone who reads those languages.** Based on these limited factors (particularly the dates on certain of the [First Set of] Assertedly Privileged Documents and the pattern of apparent interspersed Korean and Vietnamese text on one of the [First Set of] Assertedly Privileged Documents), the prosecution team decided not to review these documents further, and instead to ask you whether you intended to assert privilege over them.

Accordingly, the assumptions in your Letter are incorrect, and **the prosecution team is not aware of the contents of any of the Vietnamese or Korean text in the [First Set of] Assertedly Privileged Documents.**

(June 6 Letter at 1-2) (emphases added).

On June 15, 2026, without having responded to the Government's letter or sought to confer, Hung filed the first motion (Dkts. 153-55 (the "Initial Motion")).

On June 16, 2026, this Court ordered Hung to "produce for the Court's *in camera* review [by June 19, 2026] the documents over which he asserts attorney-client privilege in his motion at Docket Number 153" and further directed him "to identify in that submission the source of the alleged prejudice to his defense with reference to specific documents." (Dkt. 160).

### E.    The Second Privilege Assertions

On June 17, 2026, counsel for Hung informed the parties that he identified allegedly

privileged documents within the May 29 Production that he did not previously identify and that did not form the basis of his original motion (the "Second Set of Assertedly Privileged Documents"). Although the defendant did not specify which documents within the May 29 Production are included in the Second Set of Assertedly Privileged Documents, or provide any basis for such a claim, the Government immediately segregated all of the Non-Screened Documents from the prosecution team without prejudice to making any arguments or requests for relief. (Dkt. 168 at 1).

On June 19, 2026, Hung filed the supplemental motion regarding the Second Set of Assertedly Privileged Documents. (Dkt. 172, the "Supplemental Motion," and, together with the Initial Motion, the "Motions").[4] In the Supplemental Motion, Hung again does not specify which documents within the Non-Screened Documents constitute the Second Set of Assertedly Privileged Documents, nor does he explain which parts, if any, of those unspecified documents contain allegedly privileged communications that are in the English language, as opposed to Vietnamese, Korean, or some other foreign language not spoken, read, or understood by the prosecution team, and if so, what type of privilege the English language text reveals.[5]

---

[4] The Supplemental Motion defines the Second Set of Assertedly Privileged Documents as "Category 1," the First Set of Assertedly Privileged Documents as "Category 2," and the Screened Documents as "Category 3." (Dkt. 172 at 1-2).

[5] The terms of Hung's June 19, 2026 assertion of privilege to the Government include the Screened Documents, but Hung has not set forth the grounds for his assertion of privilege over the Screened Documents, and the Government is unaware whether he has provided them for the Court's *in camera* review. Although these were screened based on a filter team member's determination that they were potentially privileged, he should be required either to set forth the grounds for his assertion (and submit these documents for *in camera* review, if he has not), or to otherwise enable his assertion of privilege over these documents to be tested, such as through a privilege log. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987) (party asserting privilege has burden of establishing its application, which burden cannot be "discharged by mere conclusory or ipse dixit assertions" (citation omitted)).

## ARGUMENT

### I.  The Defendant Is Not Entitled to Discovery or a Hearing

Hung argues that an evidentiary hearing is supposedly required to determine whether the Government obtained any "insight into the defense" through its access to the Non-Screened Documents and that pre-hearing discovery into internal information about the filter team member's review procedures and communications is also supposedly necessary.  (Initial Mot. at 14-18). Hung further requests a litany of relief, including, *inter alia*, "sworn certifications from every member of the prosecution and investigative teams regarding their handling of the Assertedly Privileged Documents."  (Initial Mot. at 22-23; *see* Supp. Mot. at 4-5).  Hung's requests are legally and factually baseless.

### A.  Applicable Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."  U.S. Const. amend. VI.   The Sixth Amendment is violated when the Government knowingly and intentionally interferes with the attorney-client relationship.  *See United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991). It follows that inadvertent exposure to privileged communications is not a Sixth Amendment violation.  *See, e.g., United States v. Dupree*, 781 F. Supp. 2d 115, 163 (E.D.N.Y. 2011).  Indeed, "[w]here the intrusion upon an attorney-client communication is unintentional or justified there can be no violation of the Sixth Amendment without a showing that the intercepted communication was somehow used against the defendant to the defendant's prejudice." *United States v. Abdel Sattar*, No. 02 Cr. 0395 (JGK), 2002 WL 1836755, at *6 (S.D.N.Y. Aug. 12, 2002).

Where documents that come into the Government's possession may be privileged and also may be discoverable,  "[t]he use of a filter team is a common procedure in this District and has

been deemed adequate in numerous cases to protect attorney-client communications." *In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021) (denying "request for detailed information about the filter team review process") (citing *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *8 (S.D.N.Y. Oct. 9, 2020); *United States v. Ceglia*, No. 12 CR 876 (VSB), 2015 WL 1499194, at *1 (S.D.N.Y. March 30, 2015)); *see also United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) ("[T]he Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys."), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778 (2009); *United States v. Zeitlin*, No. 23 Cr. 419 (LAK) (S.D.N.Y. Nov. 27, 2023) (ECF No. 33 at 2) ("As is customary, at least in this District, the government is employing a team of lawyers and law enforcement personnel that is separate and apart from the team responsible for prosecuting the case . . . to identify potentially privileged materials . . . and withhold those materials from the Case Team in an effort to protect any applicable privilege."). "[T]he filter team process adequately safeguards the attorney-client privilege and the constitutional rights of the search subjects and their clients." *In re Search Warrants Executed on Apr. 28, 2021*, 2021 WL 2188150, at *2; *see United States v. Avenatti*, 559 F. Supp. 3d 274, 281-84 (S.D.N.Y. 2021) (approving of the use of filter teams and distinguishing non-binding precedents from outside the circuit).

Details of the Government's filter review process are not ordinarily subject to disclosure through Rule 16 or otherwise, nor is a defendant entitled to a hearing, including because those details concern internal Government deliberations and processes—and most fundamentally, because a defendant is not entitled to fish for an alleged violation of his rights. *See, e.g.*, *United*

*States v. Weigand*, 482 F. Supp. 3d 224, 246 (S.D.N.Y. 2020) ("Under these circumstances, a 'taint protocol' is not 'material to preparing the defense' and so does not fall within the scope of Rule 16(a)(1)(E)."). A defendant's request should be denied where a "motion for an evidentiary hearing on the government's filter team protocols . . . is based primarily on surmise." *United States v. Milton*, No. 21 Cr. 478 (ER) (S.D.N.Y. Sept. 8, 2022) (ECF No. 368 at 8).

It is the defendant's burden to show that he is entitled to hearing. Specifically, to be entitled to a hearing "to determine whether the prosecution was tainted by [alleged] exposure to privileged information . . . [d]efendants have the burden of showing a 'factual relationship' between the privileged information and the prosecution." *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *5 (S.D.N.Y. Aug. 13, 2019) (denying hearing where potentially privileged search warrant returns were inadvertently provided to the trial team). This requires more than a subject matter connection; rather, a defendant must show that privileged materials have an "apparent bearing on what are likely to be the issues in the case" and would "give the Government [an] unfair 'tactical advantage' and insight into Defendants' 'means of defeating the charges.'" *Id.* at *4 (citation omitted). It is the defendant's burden to "show 'a distinct, as opposed to a speculative, possibility of taint.'" *United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016) (quoting *United States v. Helmsley*, 726 F. Supp. 929, 933 (S.D.N.Y. 1989)), *aff'd*, 725 F. App'x 58, 61 (2d Cir. 2018). "Failure to show the requisite factual relationship is sufficient to end the inquiry." *Sharma*, 2019 WL 3802223, at *5 (quoting *United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998)) (brackets omitted).

Even where privileged and relevant material passes to the prosecution team, "[t]he general remedy for violation of the attorney-client privilege is to suppress introduction of the

privileged information at trial, not to order wholesale suppression" or another serious remedy, such as dismissal or disqualification. *United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) (internal quotation marks omitted); *see also United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994, at *2 (S.D.N.Y. Oct. 18, 2019) (same); *United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607, at *6 (S.D.N.Y. Aug. 8, 2017) (same). Indeed, even in the context of *intentional* breaches of attorney-client privilege the "[Second] Circuit never has gone so far as to adopt a per se rule" requiring those more serious remedies. *Schwimmer*, 924 F.2d at 447 (quoting *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975)). Rather, even when there is intentional intrusion, "unless 'the conduct of the Government has . . . been . . . manifestly and avowedly corrupt,' . . . a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege." *Id.* "'The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights.'" *Sharma*, 2019 WL 3802223, at *3 (quoting *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)).

## B.    Discussion

Hung's motion for discovery related to the filter team member's review and for an evidentiary hearing on the Government's alleged "insight into the defense" is based on speculative claims of taint and incorrect factual assumptions (which the Government previously corrected in the June 6 Letter). Having identified no potential prejudice to him or his defense whatsoever, Hung supplies no basis to explore the Government's filter team process or for a hearing.[6]

---

[6] Specifically, Hung requests the following eight categories of information, many of which are protected by the deliberative process privilege and/or are attorney-work product, but the Court

  1.  *The Government's Use of a Filter Team Member Was Entirely Proper and Consistent with Established Procedures in this District*

As an initial matter, Hung's accusation that the "absence of any court-approved filter protocol" in this case is somehow improper (Initial Mot. at 9-10, 11-14) is contrary to the routine practice in this District, and the cases to which Hung cites do not support his position.

In this District, prosecution teams regularly rely on other Assistant United States Attorneys and agents that are not a part of the prosecution team to conduct filter reviews of potentially privileged documents. And properly so. Hung's reliance on *United States v. Combs* is entirely misplaced. (*See, e.g.*, Initial Mot. at 3 (citing *United States v. Combs*, No. 24 Cr. 542 (AS) (S.D.N.Y.)). Despite Hung's attempt to distinguish the *Combs* filter team as different and "properly constituted and identified" (Initial Mot. at 18), in that case, like here, the filter team was comprised of individuals from the U.S. Attorney's Office for the Southern District of New York

---

need not determine the scope of such doctrines here, because the motion is baseless:

(1) all internal communications between the filter team and the trial team regarding the Le Van Hung Documents and the Assertedly Privileged Documents;
(2) all internal communications within the trial team regarding those documents;
(3) the complete written filter team protocol, if any exists;
(4) all screening logs, notes, and records maintained by the filter team;
(5) all email communications regarding Production 32, including any communications about the USAfx link and the decision to include both segregated and unsegregated materials in a single production;
(6) the identity and qualifications of all filter team members;
(7) the identity of the unnamed prosecution team member who reviewed the Non-Screened Documents; and
(8) disclosure of whether any member of the prosecution team, investigative team, or support staff used any AI tool, large language model, translation application, or other technology to translate, summarize, or assess the content of the Le Van Hung Documents or the Assertedly Privileged Documents.

(Initial Mot. at 18).

"who [we]ren't involved in the investigation or prosecution of th[e] case." (Initial Mot. at 9). There, as here, the filter team did not disclose to the defense its filter review protocol or correspondence regarding its privilege determinations. Moreover, the so-called "emergency hearing" Hung describes was ordered not because the defense claimed privilege over certain documents that the prosecution team did not read, did not plan to use, and immediately segregated (as is the case here), but rather because the prosecution sought to *rely on* certain assertedly privileged documents in connection with a bail hearing. *See Combs*, No. 24 Cr. 542 (AS) (ECF No. 88 at 8) (Court: "I understand that this was brought up as an emergency application principally because *two excerpts from these documents were used* in connection with the government's response to the renewed bail application, correct?" Defense counsel: "That is correct, Judge." (emphasis added)). Here, of course, the Government has made no assertion that it intends to use the First or Second Sets of Assertedly Privileged Documents at trial in any way, nor can it have a basis to do so, because the prosecution team has no idea about the substantive contents of the foreign-language portions of the documents other than what counsel for Hung has chosen to describe in his June 3 Letter and the Motions. And in both instances when Hung asserted privilege over the First and Second Sets of Assertedly Privileged Documents, the Government immediately "segregated them from the prosecution team." (June 6 Letter at 1; *see* Dkt. 168 at 1). Plainly, the Government does not intend to use the documents.[7]

Hung's reliance on *In re Search Warrants Executed on April 28, 2021* is similarly

---

[7] On June 16 and 18, 2026, the Court ordered Hung to produce for *in camera* review the First and Second Sets of Assertedly Privileged Documents and to identify the source of the alleged prejudice to his defense. (Dkts. 160, 170). In the event that the Court deems the documents, or portions of them, not privileged, the Government reserves the right to review those documents or portions and seek to use them at trial.

inapposite. No. 21-MC-425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021). There, it was the *Government*, not the defense, that requested a special master to review search warrant returns related to electronic devices and premises belonging to Rudolph Giuliani and Giuliani Partners LLC. *Id.* at *1. The court granted the Government's request "to ensure the perception of fairness." *Id.* at *4. In doing so, however, the court clarified that, short of a special master, "[t]he use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications." *Id.* at *2 (citing *Blakstad*, 2020 WL 5992347, at *8; *Ceglia*, 2015 WL 1499194, at *1). "Indeed, in the analogous *Michael Cohen* proceeding in 2018, Judge Kimba Wood, while appointing a special master to ensure the 'perception of fairness,' recognized the appropriateness of the use of a filter team with respect to certain communications that had been covertly obtained." *In re Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *2; *see Zeitlin*, No. 23 Cr. 419 (LAK) (ECF No. 33 at 2).

The Government is aware of no case or other authority supporting Hung's inflammatory claim that "[t]he Government's filter team arrangement"—which is consistent with every other filter team in this District—"inverts the structure it was supposed to maintain." (Initial Mot. at 11).[8]

---

[8] It further bears noting that, throughout his motion, counsel for Hung routinely cites or even purports to quote from cases for propositions that those cases do not remotely support. For example, in support of his argument that that Government's filter team was somehow tainted, counsel writes, "As the Southern District of New York has recognized, 'the appearance of fairness and the avoidance of even an inadvertent invasion of the attorney-client privilege are paramount.'" (Initial Mot. at 11 (purporting to quote *In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55, 59-60 (S.D.N.Y. 1994)). While the Government does not disagree with this as a general sentiment, that quotation simply does not exist in that case, or in any other case, based on the Government's research. (And indeed, the sentiment expressed by this quotation is not a rule of decision in the actual cases governing attorney-client privilege, which are cited

14

2.      *Hung Is Not Entitled to Details About the Filter Review Process*

As described above, Rule 16 does not permit a defendant to demand information about the Government's internal communications and processes, such as filter team review procedures and instructions, whenever he wishes to assess for himself their supposed lack of quality. *See United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("[U]nder [Fed. R. Crim. P.] 16(a)(2), [a defendant] may not examine Government work product in connection with his case."); Fed. R. Crim. P. 16(a)(2) (generally exempting from disclosure "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case"). Nor is there any other basis for a defendant generally to do so, for good reason. Filter team procedures become relevant, if ever, only when a court is called upon to evaluate whether the government's intrusion into a defendant's privileged communications, if the defendant demonstrates that such an intrusion occurred, was "manifestly and avowedly corrupt conduct," *Schwimmer*, 924 F.2d at 447, such that the defendant's Sixth Amendment right to counsel or his Fifth Amendment due process rights may have been impaired.

---

herein). This quotation appears, in short, to be a wholesale invention (perhaps as the result of using AI tools, although how the defendant came to purport to quote something that does not exist is beside the point for present purposes). (*See also* Dkt. 177 at 4 n.2 (noting instance of Hung's counsel citing nonexistent quotation in connection with motions *in limine*)).

Other of the defendant's citations are not fully nonexistent, but appear in entirely different contexts and in factually distinct situations. For example, in support of his argument that the filter team here was "nonexistent" because the *trial team* "review[ed] documents for privilege indicators, [and] ma[de] privilege-screening decisions,"—which, in any event, is false—the defendant writes, "The Second Circuit has instructed that 'the relevant inquiry is what the person did, not who the person is.'" (Initial Mot. at 12 (quoting *United States v. Hunter*, 32 F.4th 22, 49 (2d Cir. 2022) (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006))). While that quote does exist (albeit at a different pin cite), neither *Hunter* nor *Stewart* opined about the propriety of a filter team or the assertions of privilege. Rather, *Hunter* and *Stewart* concern the breadth of the prosecution team as it relates to its *Brady* disclosure obligations.

15

In the absence of a showing by the defendant of such corrupt conduct, how the Government employed a filter team is simply not subject to disclosure. *See, e.g.*, *Weigand*, 482 F. Supp. 3d at 246.

Similarly, as described above, Hung is not entitled to a hearing. Hung has not cited any authority for the proposition that he is entitled to internal information about the filter team member's review procedures in this case, let alone that he is entitled to a hearing on such an internal government matter. Contrary to Hung's assertion of a supposed "structural" failure that resulted in the Screened Documents being "improperly disclosed" (Initial Mot. at 10-11), the Government did not produce the Screened Documents to Guan, nor did the prosecution team access those documents themselves. Rather, as explained in the Hung Cover Letter accompanying the production of the Screened Documents, those documents were "segregated from the prosecution team as potentially privileged." (Dkt. 154-2). Hung offers no support for his suggestion that it was somehow improper to transmit the Screened Documents to Hung via USAfx, rather than directly from a filter team member (Initial Mot. at 10) nor does that suggestion make any sense—plainly, the method through which the Government produced the documents does not bear on whether the prosecution team violated the Sixth Amendment. And indeed, USAfx is more secure than standard email, and thus is more protective of the defendant. In short, Hung, who bears the burden, does not cogently make out any alleged deficiency warranting the extraordinary measure of a hearing.[9]

---

[9] To the extent that Hung claims that the inclusion of prosecution team members on the USAfx download link undermines the Government's representation that the Screened Documents (which were separately numbered and designated in writing as separate) were segregated from the prosecution team's review, he is wrong. Whether documents are in the possession, custody or

Indeed, Hung would not be entitled to a hearing even if he could show that the prosecution team had in fact reviewed the Screened Documents (and he cannot so show, because no such review occurred). In *United States v. Milton*, No. 21 Cr. 478 (ER), for example, the prosecution team informed the defense and the court that, despite using a filter team to screen for potentially privileged materials, a prosecution team member had viewed potentially privileged materials in search warrant returns. The government later disclosed further exposure to potentially privileged materials by the prosecution team, including, among other things, that members of the prosecution team had access to hundreds of potentially privileged communications, including several communications with members of the defendant's defense team. *See Milton*, No. 21 Cr. 478 (ER) (ECF No. 45-4 at 1-2). Nevertheless, the court denied the defendant's request for an evidentiary hearing on the government's filter team protocols, holding that "[i]nadvertent disclosure of potentially privileged information to the prosecution team is not alone a basis for relief." *Milton*, No. 21 Cr. 478 (ER) (ECF No. 368 at 8).

In sum, Hung has not even come close to making the requisite serious showing entitling him to further information about the Government's filter review process, much less a hearing.

---

control of the prosecution team does not depend on whether the prosecution team members, who are trained and aware of their obligations, have the *physical ability* to knowingly circumvent screening procedures for separately marked documents. *See, e.g.*, *United States v. Collins*, 409 F. Supp. 3d 228, 243-44 (S.D.N.Y. 2019) (holding that the portions of seized electronic account data that had been marked unresponsive to a search warrant were not within the prosecution team's possession for purposes of discovery under Rule 16 or *Brady v. Maryland*, 373 U.S. 83 (1963), notwithstanding physical ability to access portions). But of course, even if the prosecution team had accessed the Screened Documents (which it did not, and Hung has made no showing to the contrary), it would not have been able to understand any foreign language portions.

3.    *Hung Has Not Established an Intentional Intrusion Into Privileged Materials*

In his Initial Motion, Hung also repeatedly mischaracterizes the Government's statements in the June 6 Letter as a "carefully worded denial" such that it purportedly "conspicuously does not address whether any member of the prosecution or investigative team used AI-assisted translation tools" on the First Set of Assertedly Privileged Documents.  (Initial Mot. at 8; *see id.* at 2, 14).  Not so.  As noted above, the Government stated, without any caveat, that "it did not human translate, machine translate, or otherwise cause any member of the prosecution team to become aware of the contents of the Vietnamese or Korean text contained within them."  (June 6 Letter at 1; *see id.* at 1-2 ("The prosecution team member did not (and could not) read the Korean and Vietnamese text on the documents, nor did the prosecution team member use machine translation tools to do so or consult with someone who reads those languages"); *id.* at 2 ("Accordingly . . . the prosecution team is not aware of the contents of any of the Vietnamese or Korean text in the [First Set of] Assertedly Privileged Documents.")).

Hung's characterization of the Government's statements as a carefully worded denial is frivolous.  It is difficult to understand why Hung claims that the Government's denial that the prosecution team "machine translate[d]" the documents somehow does not encompass "AI-assisted translation" (Initial Mot. at 14), or, indeed, what "machine translat[ion]" could refer to *other than* AI-assisted translation.  And even leaving aside whether the denial of "machine translat[ion]" encompassed a denial of "AI-assisted translation" (which it obviously does), Hung ignores completely the Government's uncontradicted representation that it did not "*otherwise* cause any member of the prosecution team to become aware of the contents of the Vietnamese or Korean text contained within them."  (June 6 Letter at 1 (emphasis added)).  To avoid any further

shred of purported doubt, the Government herein makes crystal clear that the prosecution team did not use any human translation, machine translation, "AI-assisted translation," or any other form of translation, for any of the Non-Screened Documents, including the First and Second Sets of Assertedly Privileged Documents (or, of course, for the Screened Documents), and did not otherwise cause any member of the prosecution team to become aware of the contents of the Vietnamese or Korean text contained within them.  Hung's baseless speculation to the contrary is just that.  Translation did not occur—period.

Nor is there anything "internally inconsistent" (Initial Mot. at 14) in the Government's representations.  On May 31, 2026, the Government informed defense counsel that "we have not translated [the First Set of Assertedly Privileged Documents] or read their contents" but that "they appear that they may contain information from after Hung's arrest."  (Dkt. 154-4).  Similarly, in the June 6 Letter, the Government confirmed that it did not "human translate, machine translate, or otherwise cause any member of the prosecution team to become aware of the contents of the Vietnamese or Korean text contained within them."  (June 6 Letter at 1).  Accordingly, there is no factual basis whatsoever for Hung's speculation that the Government has any knowledge of the content of the First (or Second) Set of Assertedly Privileged Documents, let alone any "insight into the defense."  (Initial Mot. at 14).  The Government does not.

In his Supplemental Motion, counsel for Hung states that "the Government has not denied reviewing" the Second Set of Assertedly Privileged Documents and argues that it must be the case that "[s]ome significant analysis and decision making was done by the prosecution team related to these documents as they determined [on May 31, 2026] which 3 documents they felt might be privileged from a folder with 16 documents, requiring them to see differences in those 3 that

warranted the flag to defense counsel." (Supp. Mot. at 3-4).  That is wrong.

First, as stated above, the Government did not translate (by machine, software, AI, a human being, or otherwise) *any* of the Non-Screened Documents.  Accordingly, to the extent that the Second Set of Assertedly Privileged Documents consists of foreign-language text, the Government has not read them, and indeed, no member of the prosecution team can even understand them.  To the extent that they contain limited English-language text, both the filter team member and the prosecution team did not identify anything potentially privileged, and the Court will be able to make its own determination during its *in camera* review.

Second, as the Government explained to counsel for Hung on May 31, 2026, the First Set of Assertedly Privileged Documents "are in a foreign language, and, although we have not translated them or read their contents, they appear that they may contain information from after Hung's arrest." (Dkt. 154-4).  It is unclear what "significant analysis and decision making" (Supp. Mot. at 3) Hung is suggesting occurred given the Government's consistent representations about those documents.  As explained to counsel on June 6, the Team Member noticed basic attributes of the documents, including formatting, which language the documents appeared to be written in, images, isolated handwritten English language words (that did not reflect any privilege), hyperlinks, and email addresses.  (June 6 Letter at 1).  "Based on these limited factors (particularly the dates on certain of the [First Set of] Assertedly Privileged Documents and the pattern of apparent interspersed  Korean and Vietnamese text . . . the prosecution team decided not to review these documents further." (*Id.* at 2).  Accordingly, no analysis—much less "significant analysis"—

occurred beyond that.[10]

But even if the defendant could make a showing that the prosecution team somehow had knowledge of privileged information (and he cannot), his motion should nonetheless be denied because the defendant's Sixth Amendment rights plainly were not violated.  As explained above, under settled law, to make out a Sixth Amendment violation, the defendant must establish that the Government's access to any privileged material was a "manifestly and avowedly corrupt" intrusion on the defendant's Sixth Amendment rights, and that the defendant suffered prejudice as a result.[11] *Schwimmer*, 924 F.2d at 447.  The Second Circuit has characterized "manifestly and avowedly corrupt" conduct as actions that might invoke a "per se rule [that] represents a moral as well as a legal condemnation of such egregious and unequivocal conduct for which sanctions are imposed against the Government as punishment regardless of the defendant's guilt." *Gartner*, 518 F.2d at

---

[10] Indeed, the fact that the Government only inquired about three of the Non-Screened Documents corroborates the Government's uncontradicted representations to have been unfamiliar with their contents.  Hung claims that the content of all or substantially all of the Non-Screened Documents supports a claim of privilege.  The fact that the Government identified some, but not all, of the Non-Screened Documents as meriting asking Hung about corroborates that the Government was not able to understand that content.  It instead supports the Government's consistent explanation that it was able to understand only the *surface features*, not the contents, of the documents, and selected documents to ask about based on which documents happened to have surface features suggesting they post-dated Hung's arrest.

[11] In this section of his motion, too, the defendant's citations appear to be either gross mischaracterizations or serious and material errors.  For example, the defendant's citation to *Schwimmer*, 924 F.2d 443, is entirely inapposite.  (Initial Mot. at 19).  The defendant cites *Schwimmer* for the proposition that "the Government bears the burden of demonstrating that no member of the prosecution team gained insight into the defendant's communications with counsel, his state of mind regarding the charges, or his defense strategy." (Initial Mot. at 19).  But the Second Circuit in *Schwimmer*—which was decided in the context of an alleged *Kastigar* violation, not an alleged Sixth Amendment violation—held that "unless the conduct of the Government has . . . been . . . manifestly and avowedly corrupt, a *defendant* must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege." *Schwimmer*, 924 F.2d at 447 (internal citations omitted) (emphasis added).  That is literally the opposite of what Hung asserts the Second Circuit held.

21

637. Such a rule applies where the Government's "conduct has been an offensive interference with the defendant's rights without any justification." *Id.* As examples of Government conduct that might meet this standard (while still eschewing a *per se* rule), the Second Circuit has pointed to cases where the Government tried multiple defendants, including one who, unbeknownst to his co-defendants or even his attorney, was a Government informant, *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972), where the Government tried an informant along with a codefendant and the informant professed his own and his codefendant's guilt in front of the jury, *United States v. Lusterino*, 450 F.2d 572 (2d Cir. 1971), and where the Government wiretapped conversations between a defendant and her counsel before and during trial, *Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951).

Nothing of the foregoing sort occurred here. Nor does the defendant allege to the contrary. The defendant does not come close to alleging "manifestly and avowedly corrupt conduct." Indeed, the Government's conduct in this case was just the opposite. The Government took steps to protect the defendant's privilege (and indeed, even his potential privilege), including: (1) instituting a filter team member to review and screen out potentially privileged materials; (2) segregating all materials identified as potentially privileged materials from the prosecution team; (3) requesting from defense counsel—*even though the filter team member's review had not identified the documents as potentially privileged*—whether he nevertheless asserted privilege over certain of the Non-Screened Documents and refraining from reviewing those documents until counsel responded; (4) segregating the First Set of Assertedly Privileged Documents from the prosecution team once counsel asserted privilege; and (5) segregating the Second Set of Assertedly

22

Privileged Documents from the prosecution team once counsel asserted privilege.[12]

The Government's measures demonstrate its good faith efforts to avoid exposing the prosecution team, even mistakenly, to privileged material.  But even if the filter team member had inadvertently released privileged material, the very use of a filter team negates a finding of intentional intrusion on the attorney-client privilege.  *See United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776, at *15 (S.D.N.Y. Aug. 15, 2023) ("[I]n determining whether the government has intruded upon privilege, courts often consider whether the prosecution took reasonable precautions to avoid exposure to privileged materials."); *Sharma*, 2019 WL 3802223, at *3 (finding no intentional intrusion on the attorney-client privilege when government used filter protocol for materials that it knew may contain privileged communications).  Moreover, even in cases in which the case team did *not* employ a filter team to review potentially privileged material, courts in this District have declined to find constitutional violations without more.  *See United States v. Landji*, No. S1 18 Cr. 601 (PGG), 2021 WL 5402288, at *23-24 (S.D.N.Y. Nov. 18, 2021) (finding no "reckless disregard" for defendants' Sixth Amendment rights after case agents'

---

[12] Counsel's assertion that "[t]he Government's voluntary segregation [of the Second Set of Assertedly Privileged Documents] is at least an acknowledgement that [the May 29 Production] contains materials whose privilege status cannot safely be resolved through the existing filter process" (Supp. Mot. at 4) is entirely baseless.  As noted above, on June 17, 2026, counsel for Hung informed the parties—for the first time—that he identified allegedly privileged documents within the Non-Screened Documents that he did not previously identify and that did not form the basis of his original motion.  Although the defendant did not specify which documents he had newly identified as privileged, or provide any basis for such a claim, the Government immediately segregated all of the Non-Screened Documents from the prosecution team *without prejudice to making any arguments or requests for relief*.  (Dkt. 168 at 1).  The Government's actions are not an acknowledgement of any wrongdoing, but rather demonstrate that it was acting in good faith while reserving the right to argue to the Court that the documents were not, in fact, privileged.  And counsel's assertion that "[t]he privilege determinations turn, in many instances, on context that only Mr. Hung can supply" (Supp. Mot. at 2), negates the idea that the Government should have known that the documents were allegedly privileged.

"cursory review" of privileged material), *aff'd sub nom. United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025).

To hold otherwise here would contravene the uniform case law, for years, properly approving the Government's use of filter teams. Far from an intentional invasion of the privilege, courts in this District consistently recognize, "[w]here the Government has obtained potentially privileged material, use of a filter team constitutes an action respectful of, rather than injurious to, the protection of privilege." *Avenatti*, 559 F. Supp. 3d at 282 (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 522-23 (6th Cir. 2006)); *see also, e.g.*, *Yousef*, 327 F.3d at 168. That is precisely right.

### 4.    *Hung Has Failed to Sufficiently Articulate Any Prejudice*

Even if Hung had demonstrated an intentional invasion of the attorney-client relationship (which he has not come close to doing), Hung has separately failed to articulate what prejudice he suffered under these circumstances. That is an independent and fatal flaw in his claim. Indeed, although he bears the burden, he has failed to identify *any* potentially privileged portions of the documents that are not in a foreign language that the Government observed (such as dates, isolated handwritten English language words, and formatting), let alone any such portions that would have given the Government any insight, let alone useful insight, into his trial strategy.[13] *See United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985) ("to require a hearing on a claimed sixth

---

[13] In his Supplemental Motion, Hung claims that the Second Set of Assertedly Privileged Documents reveal certain defense strategy such that "[i]f comprehended by the prosecution team," could "bear directly on the upcoming trial." (Supp. Mot. at 3). But neither the filter team member nor the prosecution team identified anything potentially privileged, much less anything remotely regarding defense strategy, from the limited English-language text, nor did the prosecution team translate (by machine or in any other way) those documents.

amendment violation resulting from unintentional or justifiable presence of a government informant or agent at an attorney-client conference, a defendant must allege specific facts that indicate communication of privileged information to the prosecutor and prejudice resulting therefrom.").

Even in cases where case team members intentionally accessed actually privileged documents—and where, unlike here, those documents were in a language that could be understood by the case team members—courts have nonetheless declined to find prejudice where the defendant did not point to evidence indicating that the prosecution had read and gleaned trial strategy from the materials. *See, e.g.*, *Milton*, No. 21 Cr. 478 (ER) (ECF No. 368 at 8); *Landji*, 2021 WL 5402288, at *27 (finding no prejudice even when government had access to "highly sensitive, attorney work product material" laying out proposed trial strategy for defendant, in part, because "there [was] no evidence that any agent or prosecutor read [the material]"); *United States v. Neill*, 952 F. Supp. 834, 841-42 (S.D.N.Y. 1997) (no prejudice when case team reviewed potentially privileged materials identifying entities and persons but not trial strategy, explaining that defendants' argument that government had derived factual knowledge from the materials was "based on bare speculation"). Hung has not pointed, with any particularity at all, to any substantive information within the First or Second Sets of Assertedly Privileged Documents that, if read by the prosecution, would reveal Hung's trial strategy. (*See* Initial Mot. at 16 (vaguely describing the materials as containing "discussion of defense strategy and legal advice"); Supp. Mot. at 3 (describing the existence of documents that allegedly reveal defense strategy that would bear on the upcoming trial "[i]f comprehended by the prosecution team," but failing to state whether such defense strategy was written in a language that the prosecution team understands)). And even if

25

he had, he has *certainly* not articulated how a non-Vietnamese-speaking and non-Korean-speaking member of the prosecution team, without the use of any translation tool, encountering that information—which was in Vietnamese and Korean—could have possibly revealed his trial strategy.

Counsel for Hung also claims that the Second Set of Assertedly Privileged Documents contains "sensitive account information" (Supp. Mot. at 2) but does not explain what is meant by that phrase. To the extent that he means that the documents contain sensitive, but not privileged, information, the defendant did not produce redacted copies of such non-privileged documents to the Government, as would be required, and whether something is "sensitive" or pertains to an "account" is an entirely different question from whether it is privileged. Indeed, it would be entirely improper for the defendant to use the Government's good-faith response to his request to claw back *privileged* information to deprive the Government of the timely use of *non-privileged* information in the documents, even if he considers it "sensitive" or otherwise wishes the Government did not have access to it. To the extent that these documents are not privileged, or contain non-privileged portions (whether or not they are "sensitive"), they should be produced in redacted form to the Government immediately.

Moreover—and notwithstanding the fact that the prosecution team is not aware of the contents of the First and Second Sets of Asserted Privileged Materials such that it cannot speak directly as to the substance of those materials—there are serious reasons to doubt that the First and Second Sets of Assertedly Privileged Documents are, indeed, subject to the privileges Hung asserts in his motion. And again, this is a matter on which Hung bears the burden. *Hoey*, 2016 WL 270871, at \*4. Simply calling something privileged, without more, does not discharge that burden.

*Id.* To be clear, the Court need not reach this issue to deny Hung's motion, but Hung cannot succeed on his motion without meeting this burden *too*—and it does not appear that he can do so.

As to the marital communications privilege, the privilege is evidentiary, not constitutional. *See, e.g.*, *United States v. Pugh,* 162 F. Supp. 3d 97, 112 (E.D.N.Y. 2016), *aff'd*, 937 F.3d 108 (2d Cir. 2019), *opinion amended and superseded*, 945 F.3d 9 (2d Cir. 2019); *United States v. Wilson*, 505 F. Supp. 3d 3, 12 (D. Mass. 2020). Accordingly, even if the Government *had* accessed the First and Second Sets of Assertedly Privileged Documents, been able to understand them despite their being in foreign languages, read them in-depth, and they revealed something substantive and relevant, there would be no issue unless and until the Government attempted to offer the covered portions, if any, of the materials at trial. Because the Government does not know what they contain, it does not presently plan to do so here, and that ends this aspect of Hung's claim. *See, e.g.*, *Wilson*, 505 F. Supp. 3d at 12 (*"*Because the subject spousal [communications] have not yet been offered as evidence at trial, the government has not misused them.").

In a seeming acknowledgement that the marital communications privilege does not afford him any relief, Hung asserts that "portions" of the First Set of Assertedly Privileged Documents are not only marital communications but also are "correspondence relay[ing] communications between Mr. Hung and his attorneys through his wife." (Initial Mot. at 4, 16). According to Hung's counsel, it is his "understanding" that, while detained in Seoul, Hung was supposedly required to communicate with his then-counsel through his wife. (Decl. of Timothy C. Parlatore, Dkt. 154, (the "Parlatore Declaration") ¶ 3). Hung's counsel writes, without elaboration or citation to any basis beyond his own "understanding," that "Hung had no direct means of communicating with his United States counsel" while he was detained in Seoul and that, without his wife, Hung

27

"would have had no means of communicating with counsel at all." (*Id.*). He also writes, "[o]n information and belief," that Hung's wife "received no notice, in any language, that [her correspondence with Hung] would be monitored, read, copied, or shared" and that "[s]he wrote with the intent that the letters remain confidential between husband and wife." (*Id.* ¶ 5).

It is correct that, beyond extending to client communications, the attorney-client privilege may cover "communications made to certain agents of an attorney," including, for example, "accountants hired to assist in the rendition of legal services." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). But the law does not go nearly as far as Hung's counsel suggests. Rather, in considering whether someone qualifies as such an agent, "[w]hat is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer.*" *Id.* (emphasis in original). Importantly, this "extension" of the privilege "has always been a cabined one, and to that end, the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).

The Government is not aware of precisely what mail procedures were in place at the facilities at which Hung was detained in Seoul; nor is the Government able to assess without far more information whether it is correct that Hung's wife intended for her communications with Hung to be confidential. Even so, there are very good reasons to believe that the "cabined" extension of the attorney-client privilege would not extend to communications between a wife and husband (even where those communications touched on legal matters), where the wife knew that the husband was detained. In *United States v. Madoch*, 149 F.3d 596 (7th Cir. 1998), for instance, the Seventh Circuit considered a defendant's argument that her conviction was based on "improper

28

use of privileged communications between her and her husband"—specifically, tape-recorded conversations made while her husband was talking to the defendant on the telephone while he was detained at a federal detention center.    The court reasoned that, "because the marital communications privilege [*i.e.*, the privilege that the defendant asserts here] protects only communications made in confidence, under the unusual circumstances where the spouse seeking to invoke the communications privilege knows that the other spouse is incarcerated, and bearing in mind the well-known need for correctional institutions to monitor inmate conversations, we agree with the district court that any privilege [the defendant and her husband] might ordinarily have enjoyed did not apply." *Id.* at 602; *see also Pursley v. City of Rockford*, No. 18 Civ. 50040, 2020 WL 1433827, at *4 (N.D. Ill. Mar. 24, 2020) (collecting cases "extend[ing] *Madoch*'s reasoning to the attorney-client privilege context"), *opinion adopted*, No. 18 Civ. 50040, 2020 WL 4815946 (N.D. Ill. Aug. 19, 2020).    While Hung's counsel appears to seek to avoid this line of reasoning by putting forth his "understanding" that Hung had no "direct" means of communicating with his U.S. counsel while detained in Seoul without his wife—another assertion the Government has not verified but one that the Government doubts[14]—it was the defendant's burden to maintain the privilege, and he could have done so by writing to his wife without specifying the content of his anticipated communications with counsel.    *See Mejia*, 655 F.3d at 134 (reasoning that defendant "could have told his sister that he had an important message to relay to his attorney, regarding pleading, without specifying its content" in concluding that defendant and sister's phone

---

[14] A publicly available, English-version of a website for the Korea Correctional Service, which other publicly available sources indicate operates the Seoul Detention Center, available at https://www.corrections.go.kr/ corrections_eng/1902/subview.do, describes processes both for inmate visitation and inmate letters, which are permitted "without any limitation of frequency."

29

call while defendant was incarcerated was not privileged).

Accordingly, there are serious doubts surrounding Hung's bases for claiming that the First and Second Sets of Assertedly Privileged Materials are privileged. In any event, as noted above, the Court need not further examine those bases at this time given that the multiple fatal defects in Hung's claim. In short, his claim fails on multiple grounds even if the documents on which he rests his claim are entirely privileged.

### 5. *The Defendant Is Not Entitled to the Extraordinary Remedies of Dismissal of The Indictment or Disqualification of the Prosecution Team*

Finally, Hung's request for disqualification of the prosecution team or dismissal of the Indictment are extraordinary remedies that are not remotely called for here. That would be true even if his substantive claim had merit, which it decidedly does not.

As Hung acknowledges (Initial Mot. at 21), in *United States v. Walker*, the Second Circuit found no abuse of discretion where the district court refused to disqualify prosecuting attorneys who had reviewed four privileged documents seized from the defendant's home. 243 F. App'x 621, 623 (2d Cir. 2007). There, the Second Circuit denied the "extreme relief of disqualification," where "the prosecutors had engaged in no affirmative misconduct, and because they had gained no insight into [the] defense through their limited exposure to the handful of privileged documents." *Id.* The Court observed that it saw "no indication in the record that the prosecutors committed egregious misconduct," *id.* at 624, as is required for disqualification, and contrasted the case from *United States v. Horn*, 811 F. Supp. 739, 750-51 (D.N.H. 1992), *rev'd in part on other grounds*, 29 F.3d 754 (1st Cir. 1994). In *Horn*, the prosecutors engaged in "serious misconduct" by reviewing and copying—against the district court's explicit instructions—attorney work product that "provided an important insight into defense tactics, strategy, and problems." *Horn*,

30

811 F. Supp. at 750-51.

Here, by contrast, and as described above, *see supra* Section I.B.3, the Government acted in good faith at every step, and consistent with longstanding and approved practice. Accordingly, in the event that the Court determines both that the First and Second Sets of Assertedly Privileged Documents are indeed privileged, and that the Government was exposed to their substantive contents, notwithstanding the fact that they were written in foreign languages that the prosecution team does not understand and were not subject to translation, the Court should adhere to "[t]he general remedy for violation of the attorney-client privilege," namely, to "suppress introduction of the privileged information at trial," not order the extraordinary remedy of dismissal or disqualification. *Lumiere*, 2016 WL 7188149, at *6 (quotation marks omitted); *see Schulte*, 2019 WL 5287994, at *2, *Patel*, 2017 WL 3394607, at *6; *see also Sharma*, 2019 WL 3802223, at *3 ("'The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights.'") (quoting *De La Pava*, 268 F.3d at 165).

## CONCLUSION

For the foregoing reasons, the defendant's motions should be denied.

Dated:  New York, New York
        June 22, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:     s/ _____
        Benjamin M. Burkett
        Rebecca T. Dell
        Paul M. Monteleoni
        Amanda C. Weingarten
        Assistant United States Attorneys
        (212) 637-2455/2198/2219/2257

31